**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------- X
CIELO JEAN GIBSON, JESSICA BURCIAGA,
PAOLA CANAS, URSULA MAYES, JESSA HINTON,
JOANNA KRUPA, SARA UNDERWOOD, BRITTANY
WILCOX, JESSICA ROCKWELL, SHEENA LEE WEBER,
TAL BERKOVITCH, TIFFANY SELBY, VIDA GUERRA,
ALICIA WHITTEN, ANYA MONZIKOVA, ASHLEY
VICKERS, BROOK TAYLOR, CARISSA ROSARIO,
CORA SKINNER, EVA PEPAS, IRINA VORONINA,
And JAMILLETTE GIAXIOLA,

        Plaintiffs,       Case No. 15-cv-08168-ER

   - v. -

SCE GROUP, INC., d/b/a SIN CITY CABARET,
21 GROUP, INC., d/b/a SHOW PALACE
GENTLEMEN'S CLUB and LAMBROS MOUMOURIS,

        Defendants.
---------------------------------------------------------------------------X
SCE GROUP, INC., d/b/a SIN CITY CABARET,
21 GROUP, INC., d/b/a SHOW PALACE
GENTLEMEN'S CLUB, and LAMBROS MOUMOURIS,

        Third-Party Plaintiffs,

-against-

THE CREATIVE COMPLEX, INC., LR GRAPHICS, LLC,
d/b/a SIKGRFX and LUIS J. RAMIREZ,

        Third-Party Defendants.
---------------------------------------------------------------------------X

## <u>MEMORANDUM OF LAW IN SUPPORT OF</u><br><u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

       Eric T. Krejci, Esq.
       Courtney E. Murphy, Esq.
       CLAUSEN MILLER, PC
       *Attorneys for Defendants*
       28 Liberty Street, 39th Floor
       New York, New York  10005

### TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT.................................................................1

II.  UNDERLYING FACTS ...................................................................2

III. ARGUMENT...........................................................................4

    A.    Plaintiffs' False Endorsement Claim Under §43(A) of the Lanham Act, 28 USC §1125 Must Be Dismissed ...................................................................4

        1.    Plaintiffs Cannot Meet Their Burden to Establish a Likelihood of Confusion............................................................................5

            a)    Strength of Mark.........................................................6

            b)    Evidence of Actual Confusion.......................................11

            c)    Collateral Estoppel Re: Plaintiffs Mayes, Hinton & Weber........16

            d)    Whether The Imitative Mark Was Adopted in Bad Faith...........18

                 (1)    Social Media Posts Created by Graphic Designers.........18

                 (2)    Social Media Posts Not Created by Graphic Designers....19

            e)    Proximity of the Products and Their Competitiveness with One Another...................................................................21

            f)    Sophistication of Consumers in the Relevant market..............22

        2.    Plaintiffs Cannot Meet Their Burden to Establish That the Posts Convey a False or Misleading Representation Fact....................................22

        3.    Plaintiffs Cannot Meet Their Burden to Obtain Monetary Damages, Fees and Costs...................................................................24

    B.    Plaintiffs' Claims Under N.Y. Civil Rights Law §§50-51 Must Be Dismissed...................................................................26

    C.    Plaintiffs' Claims Under N.Y. G.B.L. §349 Must Be Dismissed...................27

    D.    Plaintiffs' Defamation Claims Must Be Dismissed...............................29

    E.    Plaintiffs' Common Law Claims Are Preempted by New York Civil Rights Law §§50 & 51...................................................................33

F.      Plaintiffs Mayes & Pepaj Do Not Have Standing to Pursue Any of Their
        Claims Based on Releases They Executed…………………………………34

V.    **CONCLUSION**……………………………………………………………....35

## TABLE OF AUTHORITIES

**Cases**

*Albert v. Apex Fitness, Inc.*,
   1997 U.S. Dist. LEXIS 8535 (S.D.N.Y. 1997) ....................................................... 7
*Ava v. NYP Holdings, Inc.*,
   64 A.D.3d 407 (1st Dept. 2009) ....................................................................... 32
*Beastie Boys v. Monster Energy Co.*,
   66 F. Supp. 3d 424 (S.D.N.Y. 2014) ......................................................... passim
*Biro v. Conde Nast*,
   963 F.Supp.2d 255 (S.D.N.Y. 2013) ............................................................ 30, 31
*Bondar v. LASplash Cosmetics*,
   2012 U.S. Dist. LEXIS 175873 (S.D.N.Y. 2012) ....................................... passim
*Bonilla v. H&M Hennes & Mauritz L.P.*,
   2014 U.S. Dist. LEXIS 197579 (S.D.N.Y. 2014) ...................................... 5, 6, 23
*Brennan's, Inc. v. Brennan's Rest., LLC*,
   360 F.3d 125 (2d Cir. 2004) ........................................................................... 21
*Bruce Lee Enters., LLC v. A.V.E.L.A., Inc.*,
   2013 U.S. Dist. LEXIS 31155 (S.D.N.Y. 2013) ............................................... 6
*Burberry Ltd. v. Horowitz*,
   2016 Bankr. LEXIS 805 (Bankr. S.D.N.Y. 2016) ........................................... 17
*Celle v. Filipino Rep. Enters. Inc.*,
   209 F.3d 163 (2d Cir. 2000) ........................................................................... 29
*Chaiken v. VV Publ. Corp.*,
   907 F.Supp. 689 (S.D.N.Y. 1995) .................................................................. 30
*Charles Atlas, Ltd. v. DC Comics, Inc.*,
   112 F. Supp. 2d 330 (S.D.N.Y. 2000) .............................................................. 21
*Civil Rights Law." Maxwell v. N.W. Ayer, Inc.*,
   159 Misc.2d 454 (Sup. Ct. N.Y. Cty. 1993) ................................................... 33
*Cummins v. Suntrust Capital Mkts., Inc.*,
   649 F. Supp.2d 224 (S.D.N.Y. 2009) .............................................................. 30
*Don King Prod., Inc. v. Douglas*,
   742 F.Supp. 778 (S.D.N.Y. 1990) .................................................................. 30
*Eastern Am. Trio Prods. v. Tang Elec. Corp.*,
   97 F.Supp.2d 395 (S.D.N.Y. 2000) ................................................................ 28
*Edmonson v. Velvet Lifestyles*,
   2017 U.S. Dist. LEXIS 219419 (S.D. Fla. July 28, 2017) ................................ 25
*Emergeny Enclosures, Inc. v. Nat'l Fire Adjustment Co.*,
   68 A.D.3d 1658 (4th Dept. 2009) .................................................................. 30
*EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.*,
   228 F.3d 56 (2d Cir. 2000) ............................................................................. 18
*Firth v. State*,
   98 N.Y.2d 365 (2002) ............................................................................... 26, 29
*George Basch Co. v. Blue Coral, Inc.*,
   968 F.2d 1532 (2d Cir. 1992) ......................................................................... 24
*Gibson v. Resort at Paradise Lakes, LLC*,
   2018 U.S.Dist. LEXIS 80471 at *27-29 (M.D.Fla. 2018) ................................ 19

*Grodin v. Liberty Cable*,
  244 AD2d 153 (1st Dept. 1997)..................................................................33
*In re Motel 6 Sec. Litig.*,
  1997 U.S. Dist. LEXIS 3909 (S.D.N.Y. 1997)...........................................33
*Jackson v. Odenat*,
  9 F. Supp.3d 342 (S.D.N.Y. 2014) .........................................................6, 20
*Ji v. Bose Corp.*,
  538 F.Supp.2d 349 (D. Mass. 2008).............................................................7
*Joan Hansen & Co. v. Everlast World's Boxing Headquarters Corp.*,
  296 A.D.2d 103 (1st Dept. 2002)...............................................................34
*Kaplan, Inc. v. Yun*,
  16 F. Supp. 3d 341 (S.D.N.Y. 2014).....................................................28, 34
*Krupnik v. NBC Universal, Inc.*,
  2010 N.Y. Misc. LEXIS 6785 (N.Y. Sup. Ct. 2010)..................................33
*Lancaster v. Bottle Club, LLC*,
  2018 U.S. Dist. LEXIS 789576 (M.D.Fla. 2018) .......................................12
*Lemon v. Harlem Globetrotters, Int'l Inc.*,
  437 D.Supp. 1089 (D. Ariz. 2006)................................................................9
*Lepore v. NL Brand Holdings LLC*,
  2017 U.S. Dist. LEXIS 163035 (S.D.N.Y. 2017) .......................................19
*Lerman v. Flynt Distrib. Co.*,
  745 F.2d 123 (2d Cir. 1984)........................................................................31
*Liberman v. Golstein*,
  80 N.Y.2d 429 (1992) .................................................................................32
*Malletier v. Dooney & Bourke, Inc.*,
  525 F.Supp.2d 558 (S.D.N.Y. 2007)...........................................................15
*Matherson v. Marchello*,
  100 A.D.2d 233 (2d Dept. 1984) ................................................................32
*Mayes v. Summit Entm't Corp.*,
  287 F.Supp.3d 200 (E.D.N.Y. 2018) ..........................................................28
*Medisim Ltd. v. BestMed LLC*,
  861 F.Supp.2d 158 (S.D.N.Y. 2012)...........................................................14
*Naked Cowboy v. CBS*,
  844 F.Supp.2d 510 (S.D.N.Y. 2012).....................................................21, 22
*New York Time Co. v. Sullivan*,
  376 U.S. 254 (1964)....................................................................................30
*New York Univ. v. Cont'l Ins. Co.*,
  87 N.Y.2d 308 (1995) .................................................................................27
*Nomination Di Antonio E Paolo Gensini S.N.C. v. H.E.R. Accessories Ltd.*,
  2009 U.S. Dist. LEXIS 117368 (S.D.N.Y. 2009) .......................................28
*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
  134 S. Ct. 1749 (2014)................................................................................25
*Osmers v. Parade Publications, Inc.*,
  430 F.Supp. 924 (S.D.N.Y. 1964) ..............................................................29
*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*,
  85 N.Y.2d 20 (N.Y. App. 1995) ............................................................27, 28

*Passelaigue v. Getty Images (US), Inc.*,
   2018 U.S. Dist. LEXIS 34004 (S.D.N.Y. 2018)................................................... 7, 10
*Pelton v. Rexall Sundown, Inc.*,
   2001 U.S. Dist. LEXIS 3825 (S.D.N.Y. 2001).................................................. 6, 7, 13
*Philips Int'l Inv., LLC v. Pektor*,
   117 AD3d 1 (1st Dept. 2014)............................................................................. 33
*Pirone v. MacMillan, Inc.*,
   894 F.2d 579 (2d Cir. 1990).......................................................................... 5, 23
*Polaroid Corp. v. Polarad Elec. Corp.*,
   287 F.2d 492 (2d Cir. 1961)..................................................................... passim
*PPC Broadband, Inc. v. Corning Optical Communs. RF, LLC*,
   2016 U.S. Dist. LEXIS 152450 (N.D.N.Y. Nov. 3, 2016) ................................. 25
*PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc.*,
   818 F.2d 266 (2d Cir. 1987)............................................................................. 24
*Roberts v. Bliss*,
   299 F.Supp.3d 240 (S.D.N.Y. 2017)................................................................ 23
*Rubio v. Barnes & Noble, Inc.*,
   2014 U.S. Dist. LEXIS 169147 (S.D.N.Y. 2014) ......................................... 6, 10
*Securitron Magnalock Corp. v. Schnabolk*,
   65 F.3d 256 (2d Cir. 1995).............................................................................. 27
*Small v. Implant Direct Mfg. LLC*,
   2014 U.S. Dist. LEXIS 154468 (S.D.N.Y. Oct. 23, 2014), *aff'd*, 609 F. App'x 650
   (Fed. Cir. 2015)............................................................................................... 25
*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*,
   588 F.3d 97 (2d Cir. 2009).................................................................................. 5
*Streetwise Maps, Inc. v. Vandam, Inc.*,
   159 F.3d 739 (2d Cir. 1998)......................................................................... 6, 22
*THOIP v. Walt Disney Co.*,
   736 F. Supp. 2d 689 (S.D.N.Y. 2010)............................................................. 22
*TufAmerica, Inc. v. Codigo Music LLC*,
   162 F. Supp. 3d 295 (S.D.N.Y. 2016).............................................................. 24
*Veritas Capital Mgmt. L.L.C. v. Campbell*,
   875 N. Y.S.2d 824 (Sup. Ct. N.Y. County, 2008), *aff'd sub nom*, 75 A.D.3d 479 (1st
   Dept. 2010) ..................................................................................................... 30
*Vista Food Exch., Inc. v. Vistar Corp.*,
   2005 U.S. Dist. LEXIS 42541 *17 (E.D.N.Y. 2005)......................................... 14
*Yamaha Int'l Corp. v. Cent. Venture*,
   1995 U.S. Dist. LEXIS 12404 (S.D.N.Y. 1995) ............................................... 17
*Zoll v. Ruder Finn, Inc.*,
   2004 U.S. Dist. LEXIS 144 (S.D.N.Y. 2004).................................................... 33

**Statutory Authorities**
section 43(A) of the Lanham Act, 28 USC §1125................................................ 4
Lanham Act, 28 USC §1125 ............................................................................ 1, 4
N.Y. Civ. Rights Law §§50 ................................................................................. 33
N.Y. Civ. Rights Law §§50-51 ......................................................... 1, 26, 27, 33
N.Y. Gen. Bus. Law §349................................................................................ 2, 27

**Rules and Regulations**

F.R.C.P. Rule 36 ............................................................................................... 26, 27, 29
Fed. R. Evid. 402, 403, 702 and 703 ........................................................................ 14

II.    **PRELIMINARY STATEMENT**

Defendants SCE Group, Inc., d/b/a Sin City Cabaret ("SCE Group"), and 21 Group, Inc., d/b/a Show Palace Gentlemen's Club ("21 Group"), by and through undersigned counsel, submit this Memorandum of Law in support of their Motion for Summary Judgment dismissing Plaintiffs' Complaint. (R.Doc. 1).   Defendants SCE Group and 21 Group operated separate gentleman's clubs located in the Bronx and Queens, New York, respectively.   Generally, the 21 different Plaintiffs in this lawsuit allege that Defendants published images of each Plaintiff on either Facebook or Instagram without Plaintiffs' consent.   Each of the eight causes of action pled in the Complaint must be dismissed as a matter of law.

Plaintiffs' first cause of action alleging false endorsement under section 43(A) of the Lanham Act, 28 USC §1125 must be dismissed as a matter of law because Plaintiffs have not, and cannot, meet their burden to establish that the social media posts in question created a likelihood of actual consumer confusion or that those posts made any false or misleading representations of fact.   However, even if Plaintiffs could meet their burden to prove violations of the Lanham Act, which Defendants dispute, Plaintiffs cannot meet their burden to prove that they are entitled to recover monetary damages, fees and costs for those violations.

Plaintiffs' second and fourth causes of action alleging violations of N.Y. Civ. Rights Law §§50-51 and defamation, respectively, must be dismissed as a matter of law because the one year statute of limitations applicable to both causes of action expired for all of the social media posts at issue in this lawsuit, with the exception of Exhibit C-4 (R.Doc. 1-1, pgs. 23-24).   Plaintiff Burciaga's defamation cause of action related to Exhibit C-4 also must be dismissed because she cannot establish that the post contains a false statement about her, cannot prove that it was published with actual malice and cannot prove any economic damages as a result of that post.

Plaintiffs' third cause of action alleging violations of N.Y. General Business Law §349 must be dismissed as a matter of law because Plaintiffs have not alleged any conduct that violates that statute, nor any damages that are recoverable under that statute. Plaintiffs' fifth through eighth causes of action all must be dismissed as a matter of law because they are preempted by N.Y. Civil Right Law §§50-51 and because Plaintiffs have failed to satisfy each and every element necessary to recover under those causes of action. Lastly, all causes of action relating to Plaintiffs Mayes and Pepaj must be dismissed because they relinquished all of their rights with regard to the images in question by executing broad releases for those images.

## III.   UNDERLYING FACTS

The causes of action pled in Plaintiffs' Complaint are all based on the 43 different social media posts that are attached to the Complaint as Exhibits A through U.[1] (Defendant's Statement of Undisputed Material Facts (the "SOF") ¶ 4). However, there are only 35 different images of Plaintiffs that were allegedly published by either SCE Group or 21 Group because some of those social media posts contain identical images. *Id.* Plaintiffs only allege that those images were published on Defendants' Facebook or Instagram pages and do not allege that Defendants published those images in any other fashion. All of the images at issue in this lawsuit, with the exception of the image contained in Exhibit C-4 (Doc. No. 1-1, pgs. 23-24), were first published by Defendants prior to October 16, 2014, with the earliest posts being made as early as November 2012. (SOF ¶¶ 105, 137).

Defendants' corporate representative, who also personally supervised the posting of images on Defendants' separate Facebook and Instagram accounts, explained that Defendants routinely used graphic designers, who were independent contractors, to create flyers related to

---

[1] All causes of action asserted by Plaintiff Brooke Taylor regarding the social media posts at Exhibit G have been discontinued with prejudice. All causes of action asserted by all Plaintiffs against Defendant Lambros Moumouris (a.k.a. Lampros Moumouris) also have been discontinued with prejudice. (Krejci Dec. Exhibits 52 & 53).

different events occurring at each establishment. (SOF ¶¶ 71-75).  Defendants paid those graphic designers a retainer fee that would be converted into "credits" that could be used for different services. (SOF ¶ 76). The graphic designer – not Defendants – would select and obtain the image of the model to be used in the flyer. (SOF ¶¶ 80-82, 91).  Defendants would only instruct the designers to use images of women wearing clothing that fit the theme of the event being promoted and never provided instructions that a particular model, or a model with a particular level of reputation or good will, should be used in the flyer. (SOF ¶ 82).

Defendants assumed that those independent contractors were experienced in the fields of graphic design and promoting events on social media and relied on their experience to perform all tasks necessary to allow SCE Group and/or 21 Group to be able to post the flyers they created on the club's social media accounts. (SOF ¶ 83-84).  After this lawsuit was filed, Defendants learned that those graphic designers did pay a fee to the "shutterstock" website to obtain the images that were used to create those flyers. (SOF ¶ 85).

Twelve of the social media posts at issue contain images that were obtained by third-party graphic designers.[2] (SOF ¶ 88).  Defendants did not create the flyers that were used in those 12 social media posts and did not direct the graphic designers to use Plaintiffs' images when creating the flyers depicted in those 12 social media posts. (SOF ⸮ 89-91).

With regard to the social media posts attached to Plaintiffs' Complaint that did not contain flyers created by a graphic designer, the images contained in those posts were obtained by performing a theme search for images with characteristics relevant to the event being promoted, such as "sexy girl in a military outfit." (SOF ¶ 92).  Defendants were not looking for a

---

[2] The social media posts that include flyers that were created by a third-party graphic designer are Exhibits B-1 to B-4; C-1 to C-3; C-5; D-1 to D-4.  (R.Doc 1-1, pgs. 7-14, 17-22, 25; R.Doc. 1-2, pgs. 2-7).

specific model to use in their social media posts, but merely sought to use the images of women wearing clothing that fit the theme of the event being promoted. (SOF ¶ 94).

Prior to receiving this lawsuit, Defendants were unaware of the names, identities or reputation of any of the Plaintiffs at issue in this lawsuit and were unfamiliar with their likenesses. (SOF ¶ 86-87). Furthermore, none of the images at issue contained any markings from which Defendants could have ascertained the name or identity of the Plaintiff depicted in the image. (SOF ¶ 93). The fact that Defendants could not identify the models depicted in any of the social media posts at issue corroborates the fact that the images at issue were only selected because they fit the theme of the event being promoted.

There was also no financial incentive for Defendants to use any particular model in the clubs' social media posts. Attendance at each club and the gross receipts for each club generally remained the same for each event, regardless of the identity of the model used in the social media posts relating to those events. (SOF ¶ 95). As the social media posts at issue in this lawsuit did not generate any additional income for each Defendant, there is no evidence that Defendants had used Plaintiffs' image to gain a financial advantage. (SOF ¶ 96).

## IV. ARGUMENT

### A. Plaintiffs' False Endorsement Claim Under §43(A) of the Lanham Act, 28 USC §1125 Must Be Dismissed.

Under section 43(A) of the Lanham Act, 28 USC §1125, Plaintiffs have the burden to establish that the Defendants, (1) in commerce, (2) made a false or misleading representation of fact (3) in connection with goods or services (4) that is likely to cause consumer confusion as to the origin, sponsorship, or approval of the goods or services." *See, Toth v. 59 Murray Enters.*, 15 Civ. 8028 (NRB), 2019 U.S. Dist. LEXIS 1355 (S.D.N.Y. Jan. 3, 2019); *Bondar v. LASplash Cosmetics,* 2012 U.S. Dist. LEXIS 175873 (S.D.N.Y. 2012) (collecting cases), recons. den. 2013

U.S. Dist. LEXIS 352 (S.D.N.Y. Jan. 2, 2013); *Beastie Boys v. Monster Energy Co.*, 66 F. Supp. 3d 424, 448 (S.D.N.Y. 2014).  Plaintiffs have failed to meet their burden of proof on the most crucial element needed to succeed on their false endorsement claims, which is the likelihood of confusion as to the source or sponsorship of defendants' products. *Pirone v. MacMillan, Inc.*, 894 F.2d 579, 584 (2d Cir. 1990).  Plaintiffs also cannot meet their burden to establish that the social media posts at issue made any false or misleading representations of fact.

Furthermore, even if Plaintiffs could meet their burden to prove all of the elements necessary to prevail on their false endorsement claims, which Defendants dispute, Plaintiffs' Lanham Act claims still must be dismissed because: 1) Plaintiffs' request for injunctive relief is moot as Defendants have already removed the social media posts in question; and 2) Plaintiffs are not entitled to monetary damages because they cannot meet their burden to prove that Defendants intentionally utilized each Plaintiffs' image to capitalize on Plaintiffs' reputation.

### 1. Plaintiffs Cannot Meet Their Burden to Establish a Likelihood of Confusion.

Plaintiffs have the burden to establish that "an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused" as to whether each Plaintiff "sponsored or otherwise approved" Defendants' use of their image. *Toth* at 15; *Pirone* at 584. Plaintiffs must establish a probability of consumer confusion, not a mere possibility, affecting numerous ordinarily prudent customers, which Defendants do not need to disprove. *Bondar, supra; Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009).

To determine whether Plaintiffs have met their burden to prove a probability of consumer confusion, the Court should apply a modified version of the eight-factor test derived from *Polaroid Corp. v. Polarad Elec. Corp.,* 287 F.2d 492, 495 (2d Cir. 1961). *Toth* at 16; *Bonilla v. H&M Hennes & Mauritz L.P.*, 2014 U.S. Dist. LEXIS 197579, at *17-18 (S.D.N.Y. 2014);

Jackson v. Odenat, 9 F. Supp.3d 342, 356 (S.D.N.Y. 2014); *Beastie Boys*, 66 F. Supp. 3d at 424. The Polaroid factors that courts in the Second Circuit use to examine claims of false endorsement include: (1) strength of the trademark; (2) evidence of actual consumer confusion; (3) evidence that the imitative mark was adopted in bad faith; (4) similarity of the marks; (5) proximity of the products and their competitiveness with one another; and (6) sophistication of consumers in the relevant market. *Id.* This list is non-exhaustive and no factor is dispositive. *See Streetwise Maps, Inc. v. Vandam*, Inc., 159 F.3d 739, 743 (2d Cir. 1998). The proper balancing of these *Polaroid* factors is considered a question of law where, as here, the predicate facts are beyond dispute. *Bonilla v. H&M Hennes & Mauritz L.P.*, 2014 U.S. Dist. LEXIS 197579, at *19 (S.D.N.Y. 2014). All of these factors, with the exception of the "similarity of the marks" factor, favor Defendants and require the dismissal of Plaintiffs' Lanham Act claims.

### a) Strength of Mark

The term "mark" applies to a plaintiff's persona and the "strength" of the mark is the level of recognition that the plaintiff has "among the segment of the public to whom the goods are advertised is directed." *See, Bruce Lee Enters., LLC v. A.V.E.L.A., Inc.*, 2013 U.S. Dist. LEXIS 31155, at *63 (S.D.N.Y. 2013); *Toth* at 17. Since the social media posts at issue here do not state the name of any Plaintiffs, the appropriate inquiry is the strength of each Plaintiff's image standing alone, not the overall strength of her name or persona. The strength of each Plaintiff's image "is a crucial factor in determining likelihood of consumer confusion." *Toth, supra; Pelton v. Rexall Sundown, Inc.*, 2001 U.S. Dist. LEXIS 3825, at *9 (S.D.N.Y. 2001).

A plaintiff has standing under the statute "only if his or her identity carries some 'level of consumer recognition.'" *Rubio v. Barnes & Noble, Inc.*, 2014 U.S. Dist. LEXIS 169147, at *9 (S.D.N.Y. 2014); *Bondar* at 25-29. "The misappropriation of a completely anonymous face could not form the basis for a false endorsement claim, because consumers would not infer that

an unknown model was 'endorsing' a product, as opposed to lending her image to a company for a fee." *Toth* at 18; *Passelaigue v. Getty Images (US), Inc.*, 2018 U.S. Dist. LEXIS 34004, at *23-24 (S.D.N.Y. 2018); *Bondar* at 27.

The Plaintiffs in this matter do not have standing under the Lanham Act and their first cause of action must be dismissed because Plaintiffs have failed to meet their burden to establish that their images carry any level of consumer recognition. Numerous courts in this District have dismissed Lanham Act claims filed by professional models as a matter of law because those models failed to meet their burden to establish the strength of their "mark." *See, Toth, supra; Pelton, supra* (holding that the model did not meet her burden to establish the strength of her "mark", even though the model appeared in a Sports Illustrated Swimsuit Issue and performed advertising work for well-known consumer products); *Albert v. Apex Fitness, Inc.*, 1997 U.S. Dist. LEXIS 8535, at *1 (S.D.N.Y. 1997) (dismissing a professional model's Lanham Act claim because no reasonable trier of fact could think that use of his picture in an advertisement implies that he personally endorsed the products). *See also, Ji v. Bose Corp.*, 538 F.Supp.2d 349, 351-352 (D. Mass. 2008) (plaintiff, a professional model, was required to prove that defendant's target audience was familiar with her personally to prevail on her Lanham Act claim).

While a consumer survey could be used to establish whether a model's image carries any level of consumer recognition, Plaintiff's survey, commissioned for this case and created and administered by Mr. Martin Buncher (the "Buncher Survey"), fails to provide any evidence regarding the strength of each Plaintiff's image. (SOF ¶¶ 6-8).

Preliminarily, there are 21 Plaintiffs. The Buncher Survey utilized only four of the 21 Plaintiffs for the survey. (SOF ¶ 9). The four Plaintiffs that were included in the Buncher Survey were Paola Canas, Ursula Mayes, Anya Monzikova and Sara Underwood. (SOF ¶ 11). The Buncher Survey failed to ask respondents any questions relative to the level of consumer

recognition, if any, of the remaining 17 Plaintiffs in this lawsuit.  By restricting the survey to just four Plaintiffs, and by failing to test for the remaining 17, the Buncher Survey failed to provide any evidence regarding the level of consumer recognition, if any, for 17 Plaintiffs.

The Buncher Survey also fails to ask any questions that are relevant to determine the level of consumer recognition, if any, of the four Plaintiffs that were included in the Buncher Survey.   The relevant question that must be answered to determine each Plaintiff's level of consumer recognition is whether "the public is familiar with [the plaintiff's] face." *See, Toth* at 25-26; *Bondar* at 29; *Edmondson, et. al. v. 2001 Live, Inc.*, 8:16-cv-03243, R.Doc. 136 at 17, (M.D.Fla. January 15, 2019) (Krejci Dec. Exhibit 52).[3]   One court that recently analyzed a survey administered by Mr. Buncher for a false endorsement case similar to this one held that the survey failed to establish the strength of the plaintiff's mark because "it did not inquire whether any of the respondents recognized Plaintiff." *Edmondson, supra.*

Similar to the surveys that Mr. Buncher administered for the *Toth* and *Edmondson* cases, the Buncher Survey in this case fails to ask whether the respondents recognized any of the models included in the survey, were familiar with those models or knew the name of those models. (SOF ¶¶ 13-15).  Based on other surveys Mr. Buncher performed for other matters, he reached the opinion that "very few people" recognize the models when those questions are asked, which may explain why those questions were not asked in the survey he performed for this case.  (SOF ¶ 16).

Mr. Buncher concedes that the Buncher Survey does not test whether any Plaintiffs' image carried any level of consumer recognition. (SOF ¶ 17).   Mr. Buncher also did not formulate any opinions regarding the strength of any Plaintiffs' image or mark because it was

---

[3] Jessica Burciaga and Irina Voronina were two of the plaintiffs in the *Edmondson v. 2001 Live, Inc.* case and are also Plaintiffs in this matter.

"not within the purview" of his assignment. (SOF ¶ 18).  Mr. Buncher claims that the objective of the Buncher Survey was to determine the role – not the recognition – of the model in Defendants' advertising and ultimately admitted that the four models used in the survey "had little, if any, recognition." (SOF ¶ 20).  Mr. Buncher's numerous concessions establish that the Buncher Survey does not establish the level of consumer recognition for any of the Plaintiffs.

Plaintiffs have not submitted any other evidence to establish the level of Plaintiffs' consumer recognition.  The fact that Plaintiffs may have participated in promotional campaigns for different brands and appeared in magazines, TV shows, and/or movies is insufficient to establish the level of consumer recognition necessary to maintain a false endorsement claim under the Lanham act.  *See, Toth* at 19-20; *Bondar, supra.*  Courts have held that plaintiffs must do more than list the brands or magazine titles they appeared in to satisfy their burden of proof, which the Plaintiffs in this matter have not, and cannot, do.  *Id.*

To establish the strength of their image in a false endorsement case such as this one, Plaintiffs must prove the level of recognition they have "among consumers of the allegedly infringing goods." *See, Edmondson, et. al. v. 2001 Live, Inc.*, 8:16-cv-03243, R.Doc. 136, (M.D.Fla. January 15, 2019), *citing, Lemon v. Harlem Globetrotters, Int'l Inc.*, 437 D.Supp. 1089, 1095 (D. Ariz. 2006).  The fact that some Plaintiffs may promote products or services that are directed at the same demographic to which Defendants cater is not sufficient to establish the strength of their image because Plaintiffs must present "specific evidence of the degree of recognition among *Defendants' consumers*." *Edmondson* at 17 (emphasis in original).  No such evidence has been presented in this case.

Courts have also held that plaintiffs cannot satisfy their burden of proof by listing the number of social media "followers" they had in the years *after* a defendant published their images.  *See, Toth* at 20.  The operative inquiry is the level of consumer recognition each

Plaintiff had at the time Defendants published their images. *Toth, supra.* (Holding that the plaintiffs' "recitations of their social media followings as of May 2018 are equally unavailing, in large part due to the fact that there is no evidence in the record as to what plaintiffs' social media followings were at the time of the publishing of the images at issue – the operative inquiry."). Most of the Plaintiffs in this matter admitted that they do not know the number of their social media followers at the time Defendants allegedly published their images in 2012, 2013, 2014 or early 2015 and admitted that they had less followers at that time.  (SOF ¶¶ 21 through 42).

As Plaintiffs must present specific evidence of the degree of recognition among Defendants' consumers, Plaintiffs would also need to establish the number of their social media followers that were also customers of the Defendants' establishments. *Edmondson, supra.*  No such evidence has been presented here.

As Plaintiffs have not identified, and cannot identify, the number of social media followers they had at the time Defendants allegedly published their images, and cannot establish the number of those followers, if any, that are also Defendants' customers, Plaintiffs have not presented any evidence to establish the level of their consumer recognition relative to their false endorsement claims.

Discovery is now closed.  The time to present such evidence has expired. As Plaintiffs have not presented any evidence to establish the level of consumer recognition they had at the time Defendants published their images, this element of the *Poloroid* analysis clearly falls in Defendants favor.  Additionally, Plaintiffs' failure to establish that their images carry any level of consumer recognition, by itself, warrants the dismissal of the first cause of action because Plaintiffs have not established standing under the Lanham Act. *Rubio* at 9; *Bondar* at 25-29; *Passelaigue* at 23-24; *Toth* at 18.

### b) Evidence of Actual Confusion

Plaintiffs also have failed to meet their burden to establish evidence of actual consumer confusion. Plaintiffs allege that "Defendants knew that their use of Plaintiffs' Images would cause consumer confusion as to Plaintiffs' sponsorship and/or employment at the Clubs" and allege that Defendants' use of Plaintiffs' Images did in fact cause that form of consumer confusion. (Complaint, R. Doc. 1 at ¶¶ 145, 146). Defendants demanded that Plaintiffs identify all evidence that supports those allegations, to which Plaintiffs responded that they would present "an expert consumer survey … concerning the consumer confusion caused by Defendants' unlawful activities." (SOF ¶ 49). The Buncher Survey is the only evidence Plaintiffs rely upon to establish actual consumer confusion. Plaintiffs have not identified or presented any other evidence that Defendants' actual customers were confused by the social media posts at issue.

While there are a total of 35 different images at issue in this lawsuit that allegedly caused separate instances of confusion among Defendants' customers, the Buncher Survey only includes five of those images that relate to only four Plaintiffs. (SOF ¶ 9-11). Mr. Buncher concedes that he does not have any data regarding confusion which may have been created by the 30 images that were not included in the survey. (SOF ¶ 54). Thus, the Buncher Survey fails to provide any evidence of actual consumer confusion for the remaining 30 images at issue.

Mr. Buncher concedes that the social media posts at issue in this lawsuit are different, as each post has "a different model or different context, different costumes, different verbiage." (SOF ¶ 55). As each of the images at issue are concededly different, the five images used in the Buncher Survey cannot be used to establish consumer confusion for the 30 images that were not included in that survey. *See, Toth* at 23 (Holding that one of the "flaws" in Buncher's survey was that it "uses only three of the 37 images at issue in this litigation … without providing an adequate explanation as to how those three images were selected or specifically how they were

representative of the other 34 images"). *See also, Lancaster v. Bottle Club, LLC,* 2018 U.S. Dist. LEXIS 789576, *21 (M.D.Fla. 2018); *Gibson v. Resort at Paradise Lakes, LLC.*, 2018 U.S. Dist. LEXIS 80471 (M.D.Fla. 2018).

Mr. Buncher admits that if a model was not part of the survey, he could not measure how that model was communicated or how her role was perceived because he "can't measure the effect of a stimulus if the stimulus is not in the test design." (SOF ¶¶ 56-57).  Mr. Buncher also admits that if the model is taken "out of the advertising, you don't know what her role has been. If you put another model in, you're talking about something else." (SOF ¶ 58).  These same concepts apply to the 30 images that Mr. Buncher did not include in his survey.  Since those 30 images are the "stimulus," and Mr. Buncher failed to include that stimulus in his survey, Mr. Buncher did not measure the effect those 30 images had on the survey's respondents.  By excluding 80+% of the plaintiffs from his survey, Mr. Buncher failed to achieve his stated objective of measuring the degree of confusion which may have been created by the use of those plaintiffs.

Furthermore, the "the identity of the endorser is a 'significant factor' and 'critical variable' in assessing likelihood of consumer confusion in a false endorsement claim." *Toth* at 25-26.  Here, Mr. Buncher admits that the identity of the models used in the Buncher Survey was irrelevant because "changing the face of that model, unless it's something real odd, like you put Dracula in it or somebody crazy like that, you're getting the same type of data from study to study with different models." (SOF ¶ 60).  Mr. Buncher also admits that the "general nature" of the message communicated by Defendants' social media posts would not have changed if a different model had been used." (SOF ¶ 59).  As Mr. Buncher concedes that the identity of the plaintiffs, the purported "endorser," was irrelevant, Plaintiffs have admittedly failed to meet this "critical variable," which "undermines plaintiffs litigative position." *Toth, supra.*

The Buncher Survey also fails to establish that there was actual consumer confusion relating to the Plaintiffs depicted in the five images that were included in the survey. With the exception of some questions regarding the demographics of the survey participants, the questions asked in the Buncher Survey at issue in this lawsuit are <u>identical</u> to Mr. Buncher's survey in the *Toth* case. (SOF ⁋ 47; Declaration of Eric T. Krejci dated January 25, 2019 ("Krejci Dec."), Ex. 10). The *Toth* court held that the questions in the Buncher Survey – which are identical to the questions at issue here – are not directed at the relevant issues in a false endorsement claim and did not provide any evidence of actual consumer confusion. *Toth* at 25.

The Buncher Survey simply demonstrates that consumers are more interested in ads which include a model, than ads which are exclusively text and does not take into consideration the elements necessary to show if confusion exists. The *Toth* court agrees with that position and held:

> That more than 90% of respondents believed that the models agreed to promote the Clubs or be in the advertisements may demonstrate that the advertisements are impliedly false, but do not speak to recognition or endorsement. Other survey results purporting to show how effective the use of plaintiffs' images were at arousing interest in the Clubs also misses the mark. The degree to which a generic model's appearance in an ad increases a consumer's interest in the Clubs is not the issue, rather, the issue is whether respondents recognized plaintiffs or understood their appearances to be endorsements of the Clubs' goods or services.

*Toth* at 25 (internal citations omitted). *See also, Bondar* at 29 (holding that the relevant issues that must be probed in a survey to evaluate the level of consumer recognition is whether "the public is familiar with [the Plaintiff's] face and believes that [Defendant's] ads imply her endorsement."); *Pelton, supra*. As the questions in Mr. Buncher's surveys in this case and the *Toth* case are identical, all of the holdings in the *Toth* case regarding the Buncher Survey that are referenced herein apply directly to this matter and should be followed by this court.

Another significant and fatal flaw in the Buncher Survey that was not present in the survey at issue in *Toth* is that Mr. Buncher accidentally included a flyer with an image of a model that is not a Plaintiff in this case in the Buncher Survey. (SOF ¶ 61; Krejci Dec. Ex. 10, pgs. 93-102). The Buncher Survey asks questions while showing three different flyers at the same time, two of which contained images of Plaintiffs Canas and Mayes, with the third containing the image of a model that is not a Plaintiff in this case. (SOF ¶ 62). Mr. Buncher conceded that since one question was asked for all three flyers, he doesn't know if the answers were responsive to, or were swayed by, the image of the non-plaintiff, rather than the images of the two plaintiffs. (SOF ¶ 63). This admission establishes that the responses relating to the images of Plaintiffs Canas and Mayes are tainted, cannot be relied upon to establish actual consumer confusion for those two posts, and are insufficient to support Plaintiffs' burden to prove actual consumer confusion.[4]

There are a number of other flaws and deficiencies which further establish that the Buncher Survey fails to present any evidence of actual consumer confusion. One of those flaws is the undisputed fact that the Buncher Survey fails to include a control group. A control group is necessary to act as a placebo, which enables the surveyor to determine the true effect of the stimulus being measured. *See, Medisim Ltd. v. BestMed LLC*, 861 F.Supp.2d 158, 178 (S.D.N.Y. 2012); *Vista Food Exch., Inc. v. Vistar Corp.*, 2005 U.S. Dist. LEXIS 42541 *17 (E.D.N.Y. 2005) (holding that a survey should be rejected when it fails to use a control product). Surveys such as this one that do not include a control group do not measure whether a social media post creates actual consumer confusion. *See, Edmondson*, 8:16-cv-03243, R.Doc. 136 at 18 (M.D.Fla.

---

[4] As the court denied Defendants' request to file Daubert motions contemporaneously with this Motion for Summary Judgment [Doc. No. 92], Defendants will file a Daubert motion seeking to preclude the Buncher Survey and Mr. Buncher's opinions and testimony pursuant to Fed. R. Evid. 402, 403, 702 and 703 by the deadlines that are ultimately set by the court, if necessary.

January 15, 2019) ("because Buncher did not use a control group of random survey respondents, the survey does not measure whether the social media posting created actual confusion.").

Questions 9.3 and 9.5 are examples of further flaws in the Buncher Survey. These questions ask respondents about the "lifestyles" either "reflected in the advertising" or "to which the clubs are oriented," without any explanation as to what the term "lifestyle" referred to. *Toth, supra*. These question are not relevant to the question of consumer confusion, but even if they were, they cannot be relied upon because they include undefined terms and "are inscrutable without further explanation." *Toth* at 24-25. Mr. Buncher admitted that these questions were designed to be subjective based on what the respondents' idea of that lifestyle is. (SOF ¶ 65). Mr. Buncher conceded that he doesn't know what the respondents believed that lifestyle to be because he never asked that question. (SOF ¶ 66). As we are unaware of what the respondents' idea of that lifestyle is, it is impossible to ascribe any meaning to their responses. Thus, the responses fail to provide any evidence of consumer confusion.

The Buncher Survey also include a number of questions that do not give respondents "the opportunity to indicate a lack of knowledge or understanding of the question," or instructions not to guess, forcing the respondents "to choose between two statements with the same flawed premise." *Toth* at 24. These are further fatal defects because the questions themselves are confusing and misleading. *See, Toth, supra; Malletier v. Dooney & Bourke, Inc.*, 525 F.Supp.2d 558, 596 (S.D.N.Y. 2007)("Consumer confusion surveys should be designed to discourage guessing.")

For example, Question 9.4 asks respondents to indicate which of the following statements they believed to be true: "The models **might participate** in some of the events described in the advertising" or "The models **would not participate** in some of the events described in the advertising." (Krejci Dec. ¶ Ex. 10, pg. 101). This question is not only irrelevant to the question

15

of consumer confusion, it is also flawed because it does not allow respondents to indicate a lack of knowledge or understanding, and includes two terms – "might participate" and "would not participate" – that are not opposing statements. *Id.* Thus, "[r]espondents who believed that the models were unlikely to participate in whatever events the survey is referring to would be forced to answer 'might participate' even if they believed there was merely a small chance that the models may participate." *Id.* Even if this question was probative of consumer confusion, which it is not, the responses to that question cannot be relied upon based on these flaws.

Overall, the Buncher Survey failed to include 30 of the 35 social media posts at issue in this litigation, failed to ask any questions that are relevant to either the strength of Plaintiffs' images or to whether actual consumer confusion exits, includes a myriad of flaws that make its results misleading and unreliable, and accidentally includes the image of a model that was not a plaintiff in this lawsuit, tainting all of the responses relative to the social media posts from Defendant SCE Group that depicted Plaintiffs Canas and Mayes. Based on the foregoing, the Buncher Survey does not provide any evidence of actual consumer confusion, is entirely irrelevant to the issues in this matter and would only serve to confuse and mislead a jury. As Plaintiffs have failed to provide any competent evidence of actual consumer confusion, the second element of the *Polaroid* analysis also strongly favors Defendants.

### c) Collateral Estoppel Re: Plaintiffs Mayes, Hinton & Weber

The *Toth* case that is cited extensively herein carries significant weight with regard to this lawsuit because it involves facts, allegations and pleadings that are substantially similar – if not nearly identical – to this lawsuit. The *Toth* case: 1) was filed by the same plaintiffs' counsel handing this matter; 2) involves three of the same models that are plaintiffs in this matter (Jessa Hinton, Sheena Lee Weber and Ursula Mayes); 3) was filed against gentlemen's clubs in the New York metropolitan area who allegedly published images of each plaintiff without plaintiffs'

consent; 4) involves the same two expert witnesses that were designated by the Plaintiffs in this matter, Messrs. Buncher and Chamberlin; 5) involves a survey prepared by Mr. Buncher that was sent to a sample population in the same geographic area and posed questions that are identical to the Buncher Survey in this matter; and 6) involves reports issued by Messrs. Buncher and Chamberlin that are virtually identical to the survey and reports that Plaintiffs proffer in this case. *See, Toth, supra.* (SOF ¶¶ 44-47). As the decision in the *Toth* case is persuasive authority within this judicial district that is based on almost identical facts, its holdings and rationale should be applied to this matter.

The decision in the *Toth* case is not only compelling authority for all of the Plaintiffs in this matter, but for Plaintiffs Jessa Hinton, Sheena Lee Weber and Ursula Mayes, it is also binding precedent that precludes them from re-litigating the issue of the level of their consumer recognition. "Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Burberry Ltd. v. Horowitz*, 2016 Bankr. LEXIS 805, at *14-15 (Bankr. S.D.N.Y. 2016). Courts have applied collateral estoppel in false endorsement claims under the Lanham Act where conclusions of law and/or fact are made against a plaintiff, and that same plaintiff seeks to re-litigate the same issue against a different defendant in a different lawsuit. *See, Yamaha Int'l Corp. v. Cent. Venture*, 1995 U.S. Dist. LEXIS 12404, at *10-12 (S.D.N.Y. 1995).

Plaintiffs Jessa Hinton, Sheena Lee Weber and Ursula Mayes had a full opportunity to litigate the issue of the level of their consumer recognition in the New York metropolitan market – which is the identical issue presented here – in the *Toth* case. As the Court in *Toth* held that each of those plaintiffs "failed to adduce evidence of a strong mark" as a matter of law, collateral estoppel applies to preclude those three plaintiffs from re-litigating that issue in this matter.

Furthermore, since the questions in Mr. Buncher's surveys in this case and the *Toth* case are identical, Plaintiffs Hinton, Weber and Mayes already litigated whether the same exact survey questions were relevant to establish consumer confusion. As the *Toth* court held that the questions in Buncher's survey are not relevant to a false endorsement claim and do not establish actual consumer confusion, collateral estoppel also applies to preclude those three plaintiffs from re-litigating that issue in this matter.

#### d) Whether The Imitative Mark Was Adopted in Bad Faith

This factor in the *Polaroid* analysis looks to "whether defendant in adopting its mark intended to capitalize on plaintiff's good will." *Toth* at 26; *EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.*, 228 F.3d 56, 66 (2d Cir. 2000). The social media posts at issue can be broken into two categories, posts that include flyers that were created by third party graphic designers and posts that did not contain such flyers.

#### (1) Social Media Posts Created by Graphic Designers

Third-party graphic designers created 12 of the social media posts at issue. (SOF ⁋ 90). Defendants did not create the flyer that was used in those social media posts. Instead, Defendants paid graphic designers - independent contractors - to create those flyers. (SOF ⁋⁋ 76, 89-90). Defendants did not direct the independent contractor to use Plaintiffs' images when creating those flyers. (SOF ⁋ 91). Defendants assumed that the independent contractor paid for, and had the authority to use, the images of the women that were included on the flyers, a fact borne out by the independent contractor who advised Defendants they did indeed purchase the images of the women depicted on the flyers from a stock image website. (SOF ¶ 83-85).

In determining whether a defendant intended to capitalize on a plaintiffs' good will, Courts in other lawsuits filed by some of the Plaintiffs here have held that similarly situated defendants "did not intend to capitalize on plaintiffs' good will" where "defendants never

specifically requested the use of any of the plaintiffs' images in their promotional materials" and, defendants were unaware "that their third-party contractors did not have the rights to use the images at issue") *See, Toth* at 27; *Gibson v. Resort at Paradise Lakes, LLC*, 2018 U.S.Dist. LEXIS 80471 at *27-29 (M.D.Fla. 2018) (Holding that "the record is devoid of evidence that Defendants intended to derive a benefit from the Plaintiffs' business reputation" because Defendant "received the images from vendors and believed they were the rightful owners of the images who were authorized to give him permission to use those images for advertising purposes")[5]. These decisions are consistent with the rule that a defendant cannot be held indirectly liable for false endorsement based on the acts of a third party under these circumstances. *See, Lepore v. NL Brand Holdings LLC*, 2017 U.S. Dist. LEXIS 163035 (S.D.N.Y. 2017).

Here, as in *Toth,* no evidence exists which states or even suggests that Defendants specifically requested the use of any Plaintiff's image in their promotional materials and Defendants were unaware "that their third-party contractors did not have the rights to use the images at issue. Thus, this Polaroid factor also favors Defendants with regard to these posts.

### (2)    Social Media Posts Not Created by Graphic Designers

For the balance of the social media posts at issue, Defendants were admittedly unfamiliar with Plaintiffs prior to this lawsuit and had no knowledge of, or familiarity with, their images, identities, respective reputations or good will. (SOF ¶¶ 86-87).  No question of fact exists that Defendants were unaware of who the Plaintiffs were and did not recognize their faces when the images were selected to be used on social media. (SOF ¶ 86-87).  Defendants could not have intended to capitalize on each Plaintiffs' reputation and good will because they had no idea who

---

[5] Plaintiffs Cielo Jean Gibson and Irina Voronina were two of the plaintiffs in the *Gibson v. Resort at Paradise Lakes* case and are also plaintiffs in this matter.

the Plaintiffs were or what their reputation was.  Whether a defendant is aware of a plaintiff's persona is a crucial element when considering if that defendant intentionally adopted the plaintiff's mark to capitalize on that plaintiff's good will.  *See, Jackson v. Odenat*, 9 F. Supp.3d 342, 359 (S.D.N.Y. 2014).  As such, it cannot be said that Defendants intended to capitalize on that which they had no knowledge of in the first instance, i.e., Plaintiffs' reputations or goodwill.

Plaintiffs also have not established that they had a reputation that Defendants would want to capitalize on, or that would resonate with Defendants' customers, as they failed to establish that Defendants' customer base would recognize each plaintiffs' image.  Furthermore, the fact that the social media posts at issue did not identify Plaintiffs by name, did not include any markings by which Plaintiffs could be identified, did not alter Plaintiffs' images to make it appear as if they were exotic dancers, and did not state or imply that those Plaintiffs would be appearing at the clubs is further support that Defendants did not intend to capitalize on each Plaintiffs' reputation and good will.  (R. Doc. 1-1 – 1-4).

Furthermore, image selection for the subject media posts issued by Defendants were determined exclusively by the theme of the image; image selection was <u>not</u> based on any individual model or model recognition potential.   More specifically, Defendants' corporate representative explained that the images that were obtained directly by the Defendants were obtain by performing a "theme" search for images with the characteristics they were looking for, such as "sexy girl in a military outfit." (Krejci Dec. Exhibit 10 at 159:17-22).  Defendants were not looking for a specific model to use in their social media posts and merely sought to use the images of women wearing clothing that fit the theme of the event being promoted. (SOF ¶ 94).  That testimony is corroborated by Defendants' communications with their third-party graphic designers, such as the communications where Defendants requested the image of a "sexy schoolgirl" to use in a "Back to School" event. (Krejci Dec. Ex. 6, pg. 22).  Defendants did not

need to, and did not seek to, use any recognizable model because, as Plaintiffs' expert explained, the identity of the model used in the social media posts is insignificant. Plaintiff also have not established that Defendants made any additional profit when a Plaintiffs' image was used to promote an event, so there is no indication that Defendants had any financial incentive to use Plaintiffs' images. All of these points support the fact that Defendants did not intentionally select plaintiffs' images to capitalize on their reputation and good will. Thus, this *Polaroid* factor also favors Defendants.

e)     **Proximity of the Products and Their Competitiveness with One Another**

This factor focuses on the degree to which the products compete with each other. *Brennan's, Inc. v. Brennan's Rest., LLC*, 360 F.3d 125, 134 (2d Cir. 2004). The two elements the court should consider for this aspect of the *Polaroid* factors are: (1) market proximity, which asks whether the two products are in related areas of commerce, and (2) geographic proximity, which looks to the geographic separation of the products. *Id.*

Here, Plaintiffs are self-proclaimed models and/or actresses that do not market or provide any services that are in competition with Defendants' gentlemen's clubs. This establishes that Plaintiffs and Defendants occupy "distinct merchandising markets." *Naked Cowboy v. CBS*, 844 F.Supp.2d 510, 517 (S.D.N.Y. 2012) (Holding that the parties occupy "distinct merchandising markets" because plaintiff "does not market or provide any services that are in competition with a daytime television series"); *Charles Atlas, Ltd. v. DC Comics, Inc.*, 112 F. Supp. 2d 330, 339 (S.D.N.Y. 2000) (holding that "DC and Atlas occupy 'distinct merchandising markets' because "DC's comic books are simply not in direct competition with Atlas's bodybuilding course").

Plaintiffs and Defendants also do not market or provide any services that are in the same geographic proximity. Defendants are gentlemen's clubs located in the Bronx and Queens,

21

respectively, while Plaintiffs do not allege to have engaged in any marketing that is focused primarily or exclusively on the New York metropolitan market. *See, Naked Cowboy, supra* (finding that the defendants produced and broadcast a television show that was "watched by millions of people across the country," while the plaintiff's performances "are heavily concentrated in the New York City area"). As the Parties occupy distinct merchandising markets and are not directly competing in the same geographic proximity, this factor also favors Defendants.

### f)  Sophistication of Consumers in the Relevant market

When considering the sophistication of buyers, the court should consider "the impression of the ordinary consumer making a purchasing decision under normal market conditions." *Streetwise Maps, Inc.*, 159 F.3d at 746. In general, "the more sophisticated the consumer, the less likely they are to be misled by similarity in marks." *THOIP v. Walt Disney Co.*, 736 F. Supp. 2d 689, 714 (S.D.N.Y. 2010).

Mr. Buncher reported that 72% of the respondents to the Buncher Survey – who are allegedly in the same market as Defendants' customers – had attended at least some level of college[6] and that 50% of the respondents had gross yearly salaries of over $75,000. (SOF ¶ 98). As the consumers in Defendants' market are both well-educated and well employed, it supports the inference that they are sophisticated consumers that are less likely to be misled by the social media posts in question. Thus, this factor also favors Defendants.

### 2.  Plaintiffs Cannot Meet Their Burden to Establish That the Posts Convey a False or Misleading Representation of Fact

---

[6] The breakdown of respondents' highest level of education was as follows: Advanced degree – 14%; Full college degree – 41%; Associates degree – 12%; Some college – 19%; High school/GED – 12%; Less than high school – 2%. (SOF ¶ 99).

Plaintiffs' Lanham Act claims also fail because Plaintiffs cannot meet their burden to establish that each social media post conveys a "false or misleading representations of fact". In the context of a false endorsement claim, this element can be satisfied when an image conveys a "misleading implication that a celebrity or public figure endorses a product, which she does not." *Toth* at 14, *citing Roberts v. Bliss*, 299 F.Supp.3d 240, 249 (S.D.N.Y. 2017). *See also, Beastie Boys,* 66 F.Supp.3d at 449 ([F]alse endorsement occurs when a defendant uses a celebrity's persona without permission to suggest a false endorsement or association."). However, since Plaintiffs have failed to establish that they have any level of consumer recognition, they must establish that the social media posts in question were not only unauthorized, but that they also used the model's image suggestively to create a false or misleading representation of fact. *Id.* This is because "consumers would not infer that an unknown model was "endorsing" a product, as opposed to lending her image to a company for a fee." *Bondar* at 9.

None of the social media posts at issue here included any suggestive content that could create a false or misleading representation of fact. The social media posts do not contain any written or explicit messages about the Plaintiffs, do not reference their names or identities in any way, do not depict them dancing at a gentlemen's club, and do not state that they would be appearing at the clubs, working at the clubs or engaged in any performances at the clubs. Thus, Plaintiffs have not, and cannot, establish that each social media post conveys a "false or misleading representations of fact".

Based on all of the foregoing, this Court must dismiss Plaintiffs' false endorsement claims as a matter of law because there are no genuine issues of material fact regarding Plaintiffs' inability to meet their burden of proof for all of the elements set forth above. *Toth* at 16, *citing Pirone, supra*; *Bonilla v. H&M Hennes & Mauritz L.P.*, 2014 U.S. Dist. LEXIS 197579, at *19 (S.D.N.Y. 2014).

### 3.   Plaintiffs Cannot Meet Their Burden to Obtain Monetary Damages, Fees and Costs

Plaintiffs have not, and cannot, establish the intent necessary to recover monetary damages under the Lanham Act.  Plaintiffs have a "greater burden" to satisfy in order to be entitled to monetary damages for violations of the Lanham Act, as they must establish that there was "actual consumer confusion or deception resulting from the violation."  *See, PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc.*, 818 F.2d 266, 271 (2d Cir. 1987); *Toth* at 29; *TufAmerica, Inc. v. Codigo Music LLC*, 162 F. Supp. 3d 295, 333 (S.D.N.Y. 2016).

For the reasons we explained is section VI.A.1.b) above (pgs. 11-17), Plaintiffs have failed to meet their burden to establish that there was actual consumer confusion for any of the social media posts at issue in this matter.  Thus, Plaintiffs must prove that the Defendants "intended to deceive the public" to obtain monetary damages. *See, Beastie Boys*, 66 F. Supp. 3d at 458.

To meet that burden, Plaintiffs "must show that the defendant adopted the plaintiff's mark with the intention of capitalizing on the plaintiff's reputation and goodwill and any confusion between his and the defendant's product."  *Beastie Boys, supra; Toth, supra*; *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1537 (2d Cir. 1992).  "[R]eckless disregard does not suffice" to prove intentional deception for purposes of Lanham Act damages. *Id.*   Plaintiff have failed to meet their burden to establish that Defendants "intended to deceive the public," based on the arguments set forth in section VI.A.1.d) above (pgs. 18-21).  Thus, even if the court were to find that the social media posts at issue violated the Lanham Act, which Defendants dispute, Plaintiffs still would not be entitled to recover monetary damages for those violations.

In addition to monetary relief, Plaintiffs also seek attorneys' fees for Defendants' alleged violations of the Lanham Act.  Plaintiffs have an even higher burden to recover those attorneys'

fees. "A district court may award fees in the rare case in which a party's unreasonable conduct – while not necessarily independently sanctionable – is nonetheless so 'exceptional' as to justify an award of fees." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1757 (2014). Finding that a case was either brought in bad faith or was exceptionally meritless "may sufficiently set [the case] apart from mine-run cases to warrant a fee award." *Id.*

Courts continue to hold claims for attorneys' fees "to a high bar" under the *Octane Fitness* standard. *See, Small v. Implant Direct Mfg. LLC*, 2014 U.S. Dist. LEXIS 154468 (S.D.N.Y. Oct. 23, 2014), *aff'd*, 609 F. App'x 650 (Fed. Cir. 2015). A party "will generally not be found to have advanced 'exceptionally meritless' claims" when the party has set forth some good faith argument in favor of its position. *Id.* Attorneys' fees are not automatically awarded if the party seeking those fees prevails on their positions. What matters is the substantive strength of the opponents' positions, not the eventual success of the opponents' positions. *See, PPC Broadband, Inc. v. Corning Optical Communs. RF, LLC*, 2016 U.S. Dist. LEXIS 152450, at *27-30 (N.D.N.Y. Nov. 3, 2016)(collecting cases).

Some of the same Plaintiffs at issue in this matter have already had their demand for attorneys' fees denied by a Florida Federal Court in a Lanham Act case alleging the misappropriation of their images.[7] *See, Edmonson v. Velvet Lifestyles*, 2017 U.S. Dist. LEXIS 219419 (S.D. Fla. July 28, 2017). In denying the request for attorneys' fees, the court held that "there is nothing exceptional about a lawsuit over the unauthorized use of a model's stock photograph to promote a business." *Id.* This lawsuit similarly involves allegations about the unauthorized use of a model's stock photographs to promote a business and there is nothing exceptional about the facts of this case that warrant the issuance of attorneys' fees.

---

[7] Plaintiffs Cielo Jean Gibson, Cora Skinner, Eva Pepaj, Irina Voronina, Jessica Burciaga, Jessa Hinton, Joanna Krupa, Paola Canas and Sara Underwood were plaintiffs in the *Edmondson v. Velvet Lifestyles* case and are also plaintiffs in this matter.

Furthermore, courts in the Southern District of New York typically award Lanham Act fees only "based on extreme misconduct during litigation," such as when the losing party engaged in "deceptive litigation practices" or based on "egregious underlying facts," such as when a defendant "continued its infringing conduct in the face of a preliminary injunction." *See, Beastie Boys*, 112 F.Supp. 3d at 46. As there has been no "extreme misconduct" during the litigation of this matter, Plaintiffs' request for attorneys' fees should be denied.

**B.      Plaintiffs' Claims Under N.Y. Civil Rights Law §§50-51 Must Be Dismissed**

Pursuant to N.Y. C.P.L.R. §215(3), claims under Civil Rights Law §§50-51 must be dismissed if filed more than one year from the date that the offending material was published. *See also, Toth* at 31; *Nussenzweig v. diCorcia*, 878 N.E.2d 589 (N.Y. 2007). The single publication rule applies to Plaintiffs' claims under these sections of New York's Civil Rights Law, which dictates that distribution of an offending publication may give rise to only one cause of action. *See, Firth v. State*, 98 N.Y.2d 365 (2002); *Bondar*, 2012 U.S. Dist. LEXIS 175873; *Shatriya v. Gilden,* 16 Misc.3d 1137A, 851 NYS2d 61 (Sup. Ct. N.Y. Cty. 2007), *aff'd*, 50 A.D.3d 586 (1st Dept. 2008). Under the single publication rule, the statute of limitations begins to run from the initial posting of the offending image on a website even if the material may be subsequently distributed, posted or used on the internet. *Id.* The single publication rule rejects the claim that each instance of such distribution and use constitutes either a separate publication or a continuing wrong which extends the date of accrual. *Id.*

This action was commenced on October 16, 2015. (R. Doc 1). Accordingly, any claims based upon images of Plaintiffs that were first published before October 16, 2014 are time-barred.

On September 15, 2016, Defendants served Plaintiffs with their First Requests for Admissions pursuant to Rule 36 of the Federal Rules of Civil Procedure via e-mail and regular

mail. (SOF ¶ 101).  Defendants re-sent Plaintiffs' counsel another copy of those Requests for Admissions via e-mail on May 9, 2017 and on July 24, 2017. (SOF ¶ 102).  As Plaintiffs did not serve Defendants with any written answers or objections to those requests within 30 days after being served on September 15, 2016, and still have not served any written answers or objections to those requests, Plaintiffs have admitted the truth of all of those requests, conclusively establishing the facts set forth therein.  *See*, F.R.C.P Rule 36.  (SOF ¶¶ 103-104).

Pursuant to F.R.C.P. Rule 36, Plaintiffs admitted that all of the images at issue in this lawsuit, with the exception of Exhibit C-4 (R.Doc. 1-1, pgs. 23-24 re: Plaintiff Burciaga), were first published by Defendants prior to October 16, 2014. (SOF ¶¶ 105 through 145). Consequently, all of Plaintiff's Civil Rights Law §§50-51 claims, with the exception of the claim based on the social media post at Exhibit C-4, are time barred and must be dismissed.

**C.     Plaintiffs' Claims Under N.Y. G.B.L. §349 Must Be Dismissed**

Plaintiffs have failed to state a claim for deceptive business practices under New York General Business Law §349 because they have not, and cannot, establish that Defendants' conduct had a broad impact on consumers at large, as opposed to conduct pertaining to private disputes between parties. *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank,* 85 N.Y.2d 20, 25 (N.Y. App. 1995); *Securitron Magnalock Corp. v. Schnabolk,* 65 F.3d 256, 257 (2d Cir. 1995). This section of General Business Law is a *consumer* statute, and as such, "the gravamen of the complaint must be consumer injury or harm to the public interest." *Securityron Magnalock, supra*; *New York Univ. v. Cont'l Ins. Co.,* 87 N.Y.2d 308, 320 (1995); *Toth* at 38-39.

In two cases involving some of the same plaintiffs at issue in this lawsuit[8], the courts held that "the general variety of consumer confusion that is the gravemen of [a false endorsement]

---

[8] Vida Guerra, Jessa Hinton, Ursula Mayes, Eva Pepaj and Sheena Lee Weber were plaintiffs in the *Toth* and/or the *Mayes v. Summit Entm't Corp.* cases and are also Plaintiffs in this matter.

claim" is an insufficient harm to the public interest for the purposes of NYGBL §349. *See, Toth* at 39; *Mayes v. Summit Entm't Corp.*, 287 F.Supp.3d 200, 206 (E.D.N.Y. 2018) (collecting cases). The "overwhelming majority" of courts in this Circuit have reached the same conclusion. *See, Toth, supra; Nomination Di Antonio E Paolo Gensini S.N.C. v. H.E.R. Accessories Ltd.*, 2009 U.S. Dist. LEXIS 117368 (S.D.N.Y. 2009) (requiring "a specific and substantial injury to the public interest *over and above ordinary trademark infringement*" in order to maintain a NYGBL §349 claim); *Kaplan, Inc. v. Yun*, 16 F. Supp.3d 341, 352 (S.D.N.Y. 2014) ("[C]ourts in New York have routinely dismissed trademark claims brought under Sections 349 and 350 as being outside the scope of the statutes ....").

None of the Plaintiffs in this matter were able to articulate any injury to the public interest. (SAC ¶¶ 146-169). All Plaintiffs conceded that they were not consumers of Defendants' services and/or conceded that this lawsuit was merely a private dispute between parties seeking damages that were personal to each plaintiff. *Id.* As Plaintiffs do not allege an injury to the public interest above and beyond "the general variety of consumer confusion," this Court must dismiss Plaintiffs' NYGBL claims. *Toth, supra.*

Plaintiffs' NYGBL claims also must be denied because Plaintiffs cannot establish that the social media posts at issue were "deceptive or materially misleading acts or practices," which is another element Plaintiffs must prove to prevail on their NYGBL § 349 claims. *See, Oswego Laborers' Local 214 Pension Fund, supra; Eastern Am. Trio Prods. v. Tang Elec. Corp.*, 97 F.Supp.2d 395, 423 (S.D.N.Y. 2000) (To prevail on a §349 claim, plaintiffs must show that defendants intentionally deceived consumers). The social media posts at issue here are not misleading as they did not identify Plaintiffs by name, did not include any markings by which Plaintiffs could be identified, did not alter Plaintiffs' images to make it appear as if they were exotic dancers, and did not state or imply that those Plaintiffs would be appearing at the clubs.

(R. Doc. 1-1 through 1-4).  Plaintiff also cannot establish that Defendants intended to deceive consumers, based on the arguments set forth in section VI.A.1.d) above (pgs. 18-21).  Based on all of the foregoing, Plaintiffs' NYGBL § 349 claims must be dismissed.

**D.    Plaintiffs' Defamation Claims Must Be Dismissed**

The statute of limitations for defamation in New York is one (1) year, which begins to run on the date the alleged defamation was first published.  *See*, N.Y. C.P.L.R. 215(3), *Firth v. State*, 98 N.Y.2d 365 (2002); *Toth* at 40*; Osmers v. Parade Publications, Inc.*, 430 F.Supp. 924 (S.D.N.Y. 1964).  The single publication rule also applies to Plaintiffs' defamation claims.  *Id.* As stated above, this action was commenced on October 16, 2015 and Plaintiffs admitted, pursuant to F.R.C.P. Rule 36, that all of the images at issue in this lawsuit, with the exception of Exhibit C-4 (R.Doc. 1-1, pgs. 23-24 re: Plaintiff Burciaga), were first published by Defendants prior to October 16, 2014. (SOF ¶¶ 105-145). Consequently, all of Plaintiff's defamation claims, with the exception of the claim based on the social media post at Exhibit C-4, are time barred and must be dismissed.

Plaintiff Jessica Burciaga's defamation claim with regard to the sole remaining social media post (Exhibit C-4) also must be dismissed.  To prove a claim for defamation, a party must show: "(1) a written defamatory statement of fact concerning the plaintiff; (2) publication to a third party; (3) fault (either negligence or actual malice depending on the status of the libeled party); (4) falsity of the defamatory statement; and (5) special damages or per se actionability (defamatory on its face)." *Toth* at 40, *citing, Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 176 (2d Cir. 2000). The defamation claim based on the social media post at Exhibit C-4 must be dismissed because Ms. Burciaga cannot establish that the post contained a false statement about her, cannot prove that the post was published with actual malice and cannot prove any economic damages as a result of that post.

Mr. Burciaga admitted that she does not take the position that this particular social media post contained a false statement about her. (SOF ¶ 170).  That social media post does not contain a "written defamatory statement of fact concerning" Ms. Burciaga because it does not identify her by name, does not include any markings by which she could be identified, does not alter the original image to make it appear as if she was an exotic dancer or was inside a gentlemen's club, and did not state that she would be appearing at Defendants' establishment.  *Cummins v. Suntrust Capital Mkts., Inc.*, 649 F. Supp.2d 224, 253 (S.D.N.Y. 2009) (a statement that does not mention the plaintiff does not support a defamation claim); *Chaiken v. VV Publ. Corp.*, 907 F.Supp. 689, 698 (S.D.N.Y. 1995); *Emergeny Enclosures, Inc. v. Nat'l Fire Adjustment Co.*, 68 A.D.3d 1658, 1661 (4th Dept. 2009); *Veritas Capital Mgmt. L.L.C. v. Campbell*, 875 N. Y.S.2d 824 (Sup. Ct. N.Y. County, 2008), *aff'd sub nom,* 75 A.D.3d 479 (1st Dept. 2010).

Ms. Burciaga is also a limited purpose public figure and, thus, must prove by clear and convincing evidence that the allegedly defamatory material was published with "actual malice – that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *See, Toth, supra, citing, New York Time Co. v. Sullivan,* 376 U.S. 254, 280 (1964); *Don King Prod., Inc. v. Douglas*, 742 F.Supp. 778, 782 n.4 (S.D.N.Y. 1990).   In the Second Circuit, a plaintiff is considered a limited purpose public figure if she "(1) successfully invited public attention to [her] views in an effort to influence others prior to the incident that is the subject of litigation; (2) voluntarily injected [her]self into a public controversy related to the subject of the litigation; (3) assumed a position of prominence in the public controversy; and (4) maintained regular and continuing access to the media." *Biro v. Conde Nast,* 963 F.Supp.2d 255, 272 (S.D.N.Y. 2013).

Ms. Burciaga alleges that she "is a well-known professional model" with a large social media following, as well as a "business owner and ambassador for multiple companies." (R.Doc.

1, ¶¶ 13, 48; SOF ¶¶ 172-173).   Ms. Burciaga has successfully and voluntarily invited public attention to her modeling career, which is the subject of this litigation.   *Id.*   Therefore, Ms. Burciaga is a limited purpose public figure for the purpose of her modeling career, subjecting her to the heightened actual malice standard.   Ms. Burciaga cannot establish that Defendant SCE Group published this social media post with actual malice based on the arguments set forth in section VI.A.1.d) above (pgs. 18-21).   *See Toth* at 42-43 ("At worst, the evidence shows that defendants failed to investigate the status of their or their contractors' rights to use plaintiffs' images, which in and of itself is insufficient as a matter of law to prove actual malice"); *Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 141 (2d Cir. 1984).

Ms. Burciaga also cannot establish that she sustained any damage as a result of this social media post, which is another element she has the burden to prove to prevail on her defamation claim.   Mr. Burciaga admitted that she didn't know if the amount she made as a model and/or actress went down after, or as a result of, this social media post. (SOF ¶ 176).   Ms. Burciaga is only claiming damages for the fair market value of the use of her image, not any specific monetary loss as a result of Defendant's publication of her image.   Furthermore, Ms. Burciaga has filed numerous lawsuits regarding the misappropriation of her images and admitted that the specific image at issue here has been misappropriated and published "multiple times" by other "strip clubs and regular nightclubs as well." (SOF ¶¶ 177-178).   Even if Ms. Burciaga could prove some diminution in her income or the amount of jobs she received – which she has not done – she still could not prove that such diminution was a result of Defendant's publication of this particular social media post, rather that the result of one of the other unauthorized uses of this same image, or of other images, by different gentlemen's clubs or other establishments.

The post also does not rise to the level of defamation *per se*.   To establish that this post is defamation *per se*, Ms. Burciaga must prove: 1) a false statement charging her with a serious

crime, 2) a false statement that tends to injure her trade, business, or profession, 3) a false statement that claims she has a loathsome disease, or 4) a false statement "imputing unchastity." *See, Liberman v. Golstein*, 80 N.Y.2d 429 (1992); *Matherson v. Marchello*, 100 A.D.2d 233 (2d Dept. 1984). The Defendant's use of her image in a social media post could not have injured her trade, business, or profession because she voluntarily appeared in promotions for, and made a personal appearance at, a different gentlemen's club in September 2014, prior to Defendants' publication of the social media post at issue. (SOF ¶ 180; Krejci Dec. Ex. 46, 47). Ms. Burciaga also previously worked as a waitress at the Spearmint Rhino Gentlement's Club. (SOF ¶ 181). Ms. Burciaga claims that her voluntary association with those gentlemen's clubs has not harmed her business. (SOF ¶ 182). As Ms. Burciaga has voluntarily associated herself with other gentlemen's clubs, any association with Defendant's gentlemen's club could not have injured her trade, business, or profession. There also were no false statements made by this social media post charging Ms. Burciaga with a crime, claiming she had a loathsome disease, or imputing unchastity.

Lastly, to prevail on a defamation *per se* claim, Ms. Burciaga also must establish that the defamation exposed her to "public contempt, ridicule, aversion or disgrace, or induce an evil opinion of her in the minds of right-thinking persons, and to depriver her of friendly intercourse in society." *Ava v. NYP Holdings, Inc.*, 64 A.D.3d 407 (1st Dept. 2009). Ms. Burciaga cannot meet this burden because she admitted that she was unaware of any jokes, ridicule, shame or any similar effect that was connected with this specific social media post. (SOF ¶ 193).

Based on all of the foregoing, Ms. Burciaga's defamation claim based on Exhibit C-4 (Doc. No. 1-1, pgs. 23-24) must be dismissed. To the extent the court holds that Plaintiffs' defamation claims based on any of the other social media posts at issue in this lawsuit are not

time barred, which Defendants dispute, the arguments raised with regard to Defendant Burciaga apply with equal force to those claims.

### E.     Plaintiffs' Common Law Claims Are Preempted by New York Civil Rights Law §§50 & 51

New York Civil Rights Law §§50-51, which is Plaintiffs' second cause of action, provides the exclusive remedy for "all common law claims based on unauthorized use of name, image, or personality ...." *See, Bondar v. LASplash Cosmetics*, 2012 U.S. Dist. LEXIS 175873 (S.D.N.Y. 2012); *Krupnik v. NBC Universal, Inc.*, 2010 N.Y. Misc. LEXIS 6785, *22-23 (N.Y. Sup. Ct. 2010); *Zoll v. Ruder Finn, Inc.*, 2004 U.S. Dist. LEXIS 144 (S.D.N.Y. 2004); *Grodin v. Liberty Cable*, 244 AD2d 153 (1st Dept. 1997). "Courts have consistently dismissed common-law claims for misappropriation, conversion, unfair competition and unjust enrichment based on an unauthorized use of an attribute of identity...on the ground that plaintiffs remedy was limited to sections 50 and 51 of the Civil Rights Law." *Maxwell v. N.W. Ayer, Inc.*, 159 Misc.2d 454, 457-458 (Sup. Ct. N.Y. Cty. 1993).

Plaintiffs' fifth cause of action for negligence and respondeat superior, sixth cause of action for conversion, seventh cause of action for Unjust Enrichment, and eighth cause of action for quantum meruit all are based on the alleged unauthorized use of Plaintiffs' images.  Thus, New York Civil Rights Law §§50-51 preempts all four of those causes of action.

Furthermore, in order to prevail on an their unjust enrichment claims, Plaintiffs must establish that there was a direct relationship between them and the Defendants. *See, In re Motel 6 Sec. Litig.*, 1997 U.S. Dist. LEXIS 3909 (S.D.N.Y. 1997).  While Plaintiffs need not allege privity or a business relationship with the Defendants, "the pleadings must assert a connection between the parties that [is] not too attenuated." *Philips Int'l Inv., LLC v. Pektor*, 117 AD3d 1 (1st Dept. 2014). The connection between the parties must be such that it "could have caused

reliance or inducement." NY Pattern Jury Instr. — Civil 4:2 (2013); *Mandarin Trading Ltd.* 16 NY3d 173 (2011). Plaintiffs must demonstrate that they themselves conferred a direct benefit on the Defendants. *Kaplan, Inc. v. Yun*, 16 F. Supp. 3d 341, 353 (S.D.N.Y. 2014). The fact that there is no such relationship between Plaintiffs and Defendants is a further basis to dismiss Plaintiff's unjust enrichment claims.

Lastly, to establish a cause of action for quantum meruit, "a plaintiff must demonstrate that the services were performed for the defendant resulting in its unjust enrichment. It is not enough that the defendant received a benefit from the activities of the plaintiff; if services were performed at the behest of someone other than the defendant, the plaintiff must look to that person for recovery." *Joan Hansen & Co. v. Everlast World's Boxing Headquarters Corp.*, 296 A.D.2d 103 (1st Dept. 2002). The fact that Defendants did not induce Plaintiffs to pose for the pictures that are the subject of this lawsuit serves as an additional basis as to dismiss Plaintiffs' quantum meruit claim.

### F.   Plaintiffs Mayes & Pepaj Do Not Have Standing to Pursue Any of Their Claims Based on Releases They Executed

Plaintiffs Ursula Mayes and Eva Pepaj do not have standing to pursue any of their claims asserted in this lawsuit that are based on the social media posts at Exhibits D1, D5, D6 and N (R. Doc. 1-2, pgs. 2-3, 8-9 and R.Doc. 1-3, pg. 14 respectively) because they each executed agreements releasing any and all of their rights to the images contained in those posts. Ms. Mayes executed numerous contracts with Dreamgirl International, which is the company who took the photos of Ms. Mayes that are contained in Exhibits D1, D5 and D6. (SOF ¶¶ 212, 213; Krejci Dec. Ex. 48, 49). In those contracts, she agreed, in return for compensation, to grant Dreamgirl International "the exclusive and absolute right and permission" to "own, assign, license, transfer, sell, distribute, copyright, use, reuse, publish, republish, exhibit, display,

produce and reproduce, print and reprint, or to authorize others to do any of the foregoing." *Id.* Those contracts waived any right Ms. Mayes had to "inspect or approve" the uses of the images that were the subject of the contract and further waived "any claim that [she] may at any time have to the eventual use to which such Images may be applied." *Id.*  These same exact contracts were at issue in the *Toth* case, where the court enforced the waivers in those contracts and dismissed Ms. Mayes' NYCRL §§50-51 claim, which was the only remaining claim pending against Ms. Mayes. *Toth* at 32-33.

Plaintiff Pepaj signed a similar release relating to the image contained in Exhibit N that contains almost identical assignments and waivers. (SOF ¶¶ 214, 215; Krejci Dec. Ex 51).  As these Plaintiffs expressly disclaimed their right to pursue claims relating to these images and gave releasees the authority to allow third-parties like the Defendants use their images in any form and for any purpose whatsoever, without limitation, Plaintiffs Mayes and Pepaj do not have any standing or right to pursue any of the causes of action in this lawsuit with regard to social media posts at Exhibits D1, D5, D6 and N, which must be dismissed as to those Plaintiffs.

## V.   **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court grant their Motion for Summary Judgment and dismiss all of Plaintiffs' causes of action, with prejudice.

Dated: January 25, 2019
     New York, New York

                           Respectfully submitted,

                           Eric T. Krejci, Esq.
                           Courtney E. Murphy, Esq.
                           CLAUSEN MILLER, PC
                           *Attorney for Defendants*
                           28 Liberty Street, 39th Floor
                           New York, New York  10005
                           Phone (212) 805-3900