UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC# _____
DATE FILED: 7/17/2019

CIELO JEAN GIBSON, JESSICA BURCIAGA,
PAOLA CAÑAS, JOANNA KRUPA, SARA
UNDERWOOD, BRITTANY WILCOX, JESSICA
ROCKWELL, TAL BERKOVICH, TIFFANY
SELBY, VIDA GUERRA, ALICIA WHITTEN,
ANYA MONZIKOVA, ASHLEY VICKERS,
CARISSA ROSARIO, CORA SKINNER, EVA
PEPAJ, IRINA VORONINA, JAMILLETTE
GIAXIOLA, URSULA MAYES, JESSA HINTON,
SHEENA LEE WEBER,

                    Plaintiffs,

           – against –

SCE GROUP, INC., *d/b/a Sin City Cabaret*; 21
GROUP, INC., d/b/a *Show Palace Gentlemen's*,

                    Defendants.

**OPINION & ORDER**

15 Civ. 08168 (ER)

RAMOS, D.J.:

 Plaintiffs, twenty models and a model's sister, bring this action against two clubs, which

feature partially nude dancers, because those clubs used Plaintiffs' pictures without their consent

in advertisements for the clubs. The parties have cross moved for summary judgment. For the

reasons set forth below, Defendants' and Plaintiffs' motions for summary judgment are

GRANTED in part and DENIED in part.

## I.    Background[1]

Defendant SCE Group, Inc. ("SCE") owns and operates a club known as Sin City Cabaret, which is located at 2520 Park Avenue, Bronx, New York. Doc. 108, 2. Defendant 21 Group, Inc. ("21 Group") owns and operates a club known as Show Palace Gentlemen's Club, which is located at 45-20 21st Street, Long Island City, New York. Doc. 108, 2. Both clubs also operate related social media accounts. Doc. 111, 63. Constantine Drakopoulos, the general manager of SCE Group, oversaw all marketing and social media for Show Palace and Sin City and served as their Rule 30(b)(6) witness. 105-5, 19, 31, 118.

SCE and 21 Group concede that the pictures of the Plaintiffs at issue herein appeared on their respective Instagram and Facebook accounts. Doc. 108, 2. Drakopoulos testified that at different times either Mike Diaz, a manager of 21 Group, or Creative Complex, an advertising agency retained by Defendants, posted the images. Doc. 111, 66.

Drakopoulos testified that Diaz found the images that he personally posted on Google and believed that the images could be used in the clubs' social media accounts because it was his understanding that any image on the internet could be used for commercial purposes. *Id.* at 67. Drakopoulos testified that Diaz would only post an image if "there [wa]s no warning or restrictions or anything that says not to use the image." Doc. 105-5, 202. Drakopoulos further

---

[1] The Court notes at the outset that over the past few years, Plaintiffs' counsel has filed nearly identical lawsuits against numerous other so-called gentlemen's clubs in this District. *See Edmondson v. RCI Hosp. Holdings, Inc.*, No. 16 Civ. 2242 (VEC), 2018 WL 4112816, at *1 (S.D.N.Y. Aug. 29, 2018) (listing cases). Indeed, Plaintiffs' counsel has brought seven similar cases on behalf of some of the plaintiffs involved in the instant case. *See Toth v. 59 Murray Enterprises, Inc.*, No. 15 Civ. 8028 (NRB), 2019 WL 95564, at *1 (S.D.N.Y. Jan. 3, 2019); *Edmondson v. RCI Hosp. Holdings, Inc.*, No. 16 Civ. 2242 (VEC), 2018 WL 4112816, at *1 (S.D.N.Y. Aug. 29, 2018); *Voronina v. Scores Holding Co., Inc.*, No. 16 Civ. 2477 (LAK), 2017 WL 74731, at *1 (S.D.N.Y. Jan. 5, 2017); *Mayes v. 490 Habitat, Inc.*, No. 18 Civ. 1427 (SJF) (GRB), 2019 WL 1429602, at *1 (E.D.N.Y. Mar. 29, 2019); *Mayes v. Summit Entm't Corp.*, 287 F. Supp. 3d 200, 202 (E.D.N.Y. 2018); *Taylor v. Trapeze Mgmt., LLC*, No. 17 Civ. 62262 (KMM), 2019 WL 1466470, at *2 (S.D. Fla. Feb. 8, 2019); *Gibson v. White's Place, LLC*, No. 3:16 Civ. 392-J-32JBT, 2017 WL 4169690, at *1 (M.D. Fla. Sept. 20, 2017). In these seven lawsuits, as in the instant lawsuit, the plaintiffs claimed that various clubs used their images on social media in violation of the Lanham Act, state privacy rights, and state prohibitions on unfair trade practices.

stated that Defendants searched for the pictures by theme, such as "sexy girl in a military outfit," and not by the names of any of the models.

With respect to the images posted by Creative Complex, Drakopoulos testified that Creative Complex told him that it purchased the pictures to create the posts. Doc. 105-5, 130–131. He later stated more broadly that Creative Complex "always purchase[d] their images" and that it "bought them through Shutterstock." *Id.* at 135–137, 261–262.

Drakopoulos also testified that neither of the clubs had a contract with any of the Plaintiffs, that he never saw or sought contracts between any third-party graphic designers and Plaintiffs, that he did not know the names of any of the Plaintiffs when the pictures were published, and that, prior to being served with the complaint, he had not heard of any of the plaintiffs in this suit. Doc. 105-5, 37–38, 56–57, and 191. Moreover, Drakopoulos testified that there did not seem to be a relationship between the alleged fame or notoriety of the models and the effectiveness of the advertisements because the profits generally remained the same for each event, regardless of the identity of the model used in the social media posts relating to those events. Doc. 108, 35.

## A.      The Use of Plaintiffs' Images

The images posted on Defendants' Facebook and Instagram accounts featured Cielo Jean Gibson, Paola Cañas, Jessica Burciaga, Ursula Mayes, Jessica Hinton, Joanna Krupa, Brittany Wilcox, Jessica Rockwell, Sara Underwood, Anya Monzikova, Sheena "Lee" Weber, Tal Berkovich, Vida Guerra, Eva Pepaj, Tiffany Selby, Irina Voronina, Jamillette Gaxiola, Ashley

Vickers, Carissa Rosario, Cora Skinner, and Alicia Whitten.[2]  According to Drakopoulos, Defendants selected these pictures to imply that their performers are attractive.  Doc. 111, 68.

### 1.    Gibson

Gibson has served as a model for the Falken Drift Team, Short Block Technologies, and Top Rank Boxing.  Doc. 111, 7.  To the best of her recollection, she had approximately 50,000 Instagram followers in 2015.  Doc. 102-4, 3.  She testified that she did not have as many followers in 2013 as she did in 2015 but she did not know the specific number.  Doc. 105-14, 68–69.

The picture Defendants posted of Gibson is from a 2002 or 2003 photography shoot. Doc. 111, 9.  For that shoot, Gibson gave the photographer limited permission to use her image. Doc. 111, 9.  According to timestamps on Instagram, the picture of Gibson was first posted in the week of July 16, 2013.  1-1, 2–4.[3]

### 2.    Cañas

Cañas has served as the face for Curve Lingerie, Masters Gold Tournament in Dubai, and the International Surf and Sport Expo in Orlando, Florida.  Doc. 111, 12.  Additionally, she has appeared on numerous television shows and worked for SOHO, KISS Underwear, Salon International, Zona Rosa, and Esteban Escobar.  *Id*. at 12.  To the best of her recollection, approximately 100,000 people followed her Instagram account in 2015.  *Id.*

The two pictures of Cañas come from a 2011 or 2012 shoot for *Espiral Catalog*.  Doc. 111, 14.  Cañas testified that she signed an agreement with *Espiral Catalog* and that the contract

---

[2] On January 24, 2019, Brooke Taylor filed a stipulation of voluntary dismissal for her claim against all Defendants. Doc. 93.

[3] The Court provides the day the pictures were posted if provided, otherwise the week.

only allowed the images to be used for the brand. Doc. 105-15, 49. According to time stamps on the pictures, the most recent picture was posted during the week of September 21, 2014. Doc. 1-1, 6–15. These images were posted by Creative Complex. Doc. 108, 32.

### 3. Burciaga

Burciaga has appeared in *Playboy*, *Maxim*, *Import Tuner*, *Modified Mag*, *Performance Auto & Sound*, *Show Latina*, and *Lowrider* magazines. Doc. 111, 9. To the best of her recollection, she had 35,000 Facebook followers, 1,200,000 Instagram followers, and 150,000 Twitter followers in 2015. *Id.*

One picture of Burciaga is from a 2006 shoot for *Stuff* magazine. Doc. 111, 11.[4] Burciaga testified that she signed a release with *Stuff* magazine and that she could not recall the details of the release. Doc. 105-16, 65–66. According to timestamps on the social media posts, the pictures were posted on January 25, 2013, November 15, 2013, January 19, 2014, and on certain dates 87 weeks, 49 weeks, and 15 weeks before August 4, 2015. Doc. 1-1, 17–27. Creative Complex posted all of these images except for the one posted 15 weeks before August 4, 2015. Doc. 108, 32.

### 4. Mayes

Mayes has appeared in *Deal or No Deal*, *Minute to Win It*, *The Tonight Show*, *The Jay Leno Show*, and *Vogue*, *Elle*, *In Style*, *Cosmopolitan*, and *Marie Claire* magazines. She works for CESD Talent Agency, Brand Model & Talent Agency, and Abstract Talent Agency. Doc. 111, 15. In her declaration, she testified that she had approximately 10,000 Facebook followers

---

[4] Burciaga could not recall the origin of the other pictures but thought that they may "possibly" be from hiphoplead.com. Doc. 102-4, 11–12.

and 5,000 Instagram followers in 2015. *Id.* She did not know how many followers she had in 2013. Doc. 105-16, 93–94.

All of the pictures of Mayes, except for one that she took herself, were shot for *Dreamgirl Magazine* between 2005 and 2007. Doc. 105-16, 23–24. Defendants have provided contracts between Mayes and *Dreamgirl Magazine* because Plaintiffs produced them in discovery for other cases. Doc. 105-51, 9–20.[5] Each contains a release but with slightly different language. The 2007 release gave "permission for Dreamgirl to produce, copyright, and/or publish my photograph or images." *Id.* at 19.[6] The posts of Mayes occurred on March 13, 2013, July 1, 2013, December 29, 2013, and 107 weeks, 45 weeks, 25 weeks before August 4, 2015. Doc. 1-2, 2–9. All of these images, except for those posted on December 29, 2013, and March 13, 2013, were posted by Creative Complex. Doc. 108, 32.

**5. Hinton**

Hinton has modeled for *Playboy*, *FHM*, *Kandy*, *MMA Sports*, *Guitar World*, and *Muscle & Fitness* magazines, Milwaukee's Best Beer, Affliction Clothing, Enzo, Milano Hair Products, REVIV Wellness Spa, Protein World, Rhonda Shear Shapewear, Leg Avenue, and Roma Costume. Doc. 111, 19. She has appeared on *Victory Poker* and *Top Rank Boxing*. *Id.* To the best of her recollection, she had 1,500,000 social media followers in 2015. Doc. 111, 19. She did not know how many followers she had in 2014. Doc. 105-18, 95–96. The three pictures of Hinton are from an Elegant Moments photography shoot in 2013 or 2014, a *Playboy* photography shoot in 2011, and an Affliction photography shoot in 2011 or 2012. Doc. 111,

---

[5] Mayes did not recall if she signed a release with *Dreamgirl Magazine* and she testified that neither she nor her agents have a copy of her contracts. Doc. 105-16, 27–29.

[6] Defendants have also provided a 2008 release between Dreamgirl and Mayes, a year after the pictures were taken.

21.[7]  Two of Hinton's pictures were posted on April 4, 2014, and February 21, 2014.  Doc. 1-2,

11–13.  The last picture lacks a timestamp.

## 6.    Krupa

Krupa has appeared in *Max Havoc:  Curse of the Dragon*, *Superstars*, *Dancing with the Stars*, *Poland's Top Model*, *The Real Housewives of Miami*, and *Playboy, Personal, Steppin' Out, Envy, Shape, FHM, Stuff, Inside Sport, Teeze,* and *Maxim* magazines.  Doc. 111, 21–22.  She was also named the "Sexiest Swimsuit Model in the World," Germany's *Maxim* "Model of the Year," and number 55 on *Maxim*'s "Hot 100" list.  Doc. 111, 22.  *Id.*  She declared that, in 2015, she had approximately 800,000 Facebook followers, 800,000 Instagram followers, and 800,000 Twitter followers.  *Id.*  She did not know how many followers she had in 2013 or 2014.  105-19, 177–178.

According to Krupa's declaration, her pictures come from a *Spec* photography shoot in approximately 2013 and from a *Femme Fatales Magazine* shoot in approximately 2006.  Doc. 102-4, 4–5.  In her deposition, however, she testified that one image could have come from a *Poker Magazine* photography shoot from 2007.  105-19, 40.  She testified that "either myself or an agent or manager at the time probably" signed a release or other documents related to this shoot.  *Id.* at 45.  She did "not know the exact terms of the agreement," but assumed that "the only rights they would have is for the specific project or magazine that I did the photo shoot for." *Id.*  at 48–49.  Krupa's pictures were posted on April 30, 2014 and June 30, 2013.  Doc. 1-2, 15–16.

---

[7] Hinton testified that Richard Masuda took the first picture of her and that they did not enter into a written or oral contract to limit either party's control of the image.  105-18, 51–59.

## 7.    Rockwell and Wilcox

Rockwell has appeared in *Angry Video Game Nerd: The Movie*, *Immigrants*, *A Que No Puedes!*, *Sons of Anarchy*, *Entourage*, *Knight Rider*, *Heroes*, *Hooter's Magazine*, *Hooter's Calendar*, *Extreme RC Car Magazine*, *No Fear Calendar*, *Shift Calendar*, and in catalogues for Dreamgirls Lingerie.  Doc. 111, 28.  She remembers having approximately 2,000 Instagram followers in 2015.  *Id.*  She did not recall how many followers she had in 2013.  Doc. 105-21, 128.  Wilcox, Rockwell's sister, is not a model.  Doc. 111, 61.

The picture of Wilcox and Rockwell is from a promotional event for Sports by Brooks. Ex. 105-21, 49.  Rockwell recalled signing a release for the business's purposes but she did not have a copy of the release.  *Id.* at 52–53.  The picture was published on November 1, 2013.  Doc. 1-2, 21.

## 8.    Underwood

Underwood has appeared in *Playboy*, *The House Bunny*, *Miss March*, *Kendra*, *The Girls Next Door*, *Attack of the Show*, and *Bridget's Sexiest Beaches*.  Doc. 111, 25.  According to her declaration, she remembered having approximately 8,000,000 social media followers in 2015. *Id.*  She did not know how many social media followers she had in 2013 or 2014.  105-22, 88.

Two of the pictures of Underwood were used.  One was either taken by her or by a friend. 105-22, 50.  Underwood could not recall when she took the other picture of herself.  Doc. 102-4, 42.  The pictures were published on August 23, 2013, and April 25, 2014.  Doc. 1-3, 2–3.

## 9.    Monzikova

Monzikova, once named one of the 100 Most Beautiful People in the World by *People Magazine*, has appeared in *Deal or No Deal*, *Maxim*, *Cosmopolitan*, *Vogue*, *Runway*, *Melissa & Joey*, *Aspen*, *Bones*, *Body of Proof*, *CSI*, *Knight Rider*, *In Plain Sight*, *Zombie Apocalypse*, *Too*

*Little Too Late*, *Somebody Marry Me*, *Seeking Dolly Parton*, *Surrogates* and a national advertising campaign for Gilt.com. Doc. 111, 44. She recalls having approximately 10,000 social medial followers in 2015. *Id.* She did not recall how many followers she had in 2013. Doc. 105-23, 102–103.

The picture of Monzikova comes from a photography shoot for Dreamgirl's Halloween costume catalog sometime around 2010. Doc. 105-23, 37–39. Monzikova testified that she signed a contract for the shoot and that the acceptable uses for the images were Dreamgirl, its catalog and website. *Id.* at 55–56. She also testified that she had not seen it recently and that she could not testify about the contract's terms. *Id.* at 54–55. The picture was published on May 18, 2013. Doc. 1-3, 5.

**10.    Weber**

Weber has appeared in *Playboy*, *Maxim*, *People*, and *Street Customs Magazine*, *The Reality of Speed*, *Harold and Kumar 2*, and *The Pool Boys*. She has served as a SSI Spokesmodel and is currently the Director of Business Development at Harmony Medcare. Doc. 111, 30. She remembers that, in 2015, she had approximately 5,000 Facebook followers and 3,000 Instagram followers. Doc. 111, 31. She did not recall how many social media followers she had in 2014. Doc. 105-24, 219.

The picture of Weber was originally created for her website in approximately 2005. *Id.* at 21. In her declaration, she states that the photographer had limited permission to use the image and that he or she did not have authority to use the images for any purposes but those agreed-upon. Doc. 102-4, 54. The picture was posted on May 9, 2014. Doc. 1-3, 7.

## 11.    Berkovich

Berkovich has appeared in advertisement campaigns for Vine Versa Cosmetics, Aston Martin, Old Spice, and Bose. Doc. 111, 33. She remembers having approximately 3,000 Facebook followers and 8,000 Instagram followers in 2015. *Id.* Berkovich did not know how many followers she had in 2013. Doc. 105-25, 96–97.

Berkovich's picture was originally shot for *T3 Magazine* around 2007. Doc. 111, 35. She testified that she did not remember seeing a contract or an agreement related to the shoot. Doc. 105-25, 77. The picture was posted on January 20, 2013. Doc. 1-3, 9.

## 12.    Guerra

Guerra, at one point *FHM*'s "Model of the Year" and number 26 on *FHM*'s "Top 100 Sexiest Females." Doc. 111, 38. She has appeared in *DUB*, *Smooth*, *Escape*, *Open Your Eyes*, *El Gordo y La Flaca*, *The Chappelle Show*, *National Lampoons Dorm Daze 2*, *Vida Guerra: Exposed*, *Scarface: The World is Yours*, and music videos for Kanye West and Nelly. Doc. 111, 38. She remembers that in 2015 she had approximately 1,600,000 Facebook followers, 250,000 Instagram followers, and 250,000 Twitter followers. *Id.*

The pictures of Guerra come from a 2003 or 2004 photography shoot for *FHM* and from a 2003 or 2004 photography shoot for *Black Men's Magazine*. Doc. 111, 41. For the first picture, Guerra testified that she did not have any written or oral contracts with *FHM*. Doc. 105-26, 51–53. She also testified that she did not recall signing any documents with *Black Men's Magazine* but that she "probably" did not sign a release. *Id.* at 60. She further testified that there was a verbal agreement for the image "[j]ust to be in the magazine." *Id.* at 60. The first picture was posted on May 2, 2013. Doc. 1-3, 11. It is unclear from the exhibit attached to the complaint when the second picture was posted. Doc. 1-3, 12.

### 13.    Pepaj

Pepaj has appeared in *The Hand Off*, *Interior*, *Leather Bar*, *The Romp*, *True Detective*, and in commercial campaigns for Diet Coke. Doc. 111, 53–54. She remembers having approximately 25,000 Instagram followers in 2015. *Id.* She testified that she did not maintain a Facebook or Instagram account in 2013. Doc. 105-27, 144.

The picture of Pepaj comes from a 2013 photography shoot with Leg Avenue. Doc. 111, 55. Pepaj produced contracts between her and Leg Avenue for 2009 and 2007. In those contracts, Pepaj "irrevocably assign[ed] to Leg Avenue . . . the unrestricted rights to copyright, use, publish, sell, or distribute images of me which it has had taken this day." Doc. 112-1, 7. There is no evidence that these contracts from 2007 and 2009 covered Pepaj's 2013 shoot. The picture was posted on April 4, 2013. Doc. 1-3, 14.

### 14.    Selby

Selby, a *Playboy* Playmate of the Month in 2007 and a two-time Miss Hawaiian Tropic, has appeared in *The Girls Next Door*, *Bikini Destinations*, *Poor Man's Bikini Beach*, *Last Comic Standing*, and *Deal or No Deal*. Doc. 111, 35. She has appeared in advertising campaigns for Guitar Hero 5, A Lounge, Reflections Boutique, Budweiser, Suzuki, Bang Vodka, Skoal, Stacker 2, Hawaiian Tropic, and Guitar Center. Doc. 111, 35–36. To the best of her recollection, she had approximately 3,000 Facebook followers and 10,000 Instagram followers in 2015. *Id.* at 36.

Selby's picture comes from a costume or a lingerie catalog from approximately 2005 or 2006. Doc. 105-28, 33. Initially, Selby testified that she remembered signing a release or other documents in connection with this shoot but that she neither retained the documents nor recalled their contents. *Id.* at 40. She later testified, "I'm pretty sure the lingerie company owns the

rights to them but I'm not—I really don't know because I don't remember." *Id.* at 40–41. The

picture of Selby was posted on November 17, 2012. Doc. 1-4, 2.

**15. Voronina**

Voronina, who was *Playboy's* Miss January 2001 and *Kandy Magazine*'s 2013 Model of

the Year, has appeared in *FHM*, *Maxim*, *Playboy*, *Max* (Italy), *Ocean*, *Shape*, *944*, *Knockout*, Q

(UK), *People* (Australia), *Kandy*, *Rukus*, *Vape*, *Reno 911!: The Movie*, *Svetlana*, *Saul of the*

*Mole Men*, *iCarly*, *Balls of Fury*, *Piranha 3DD*, *Laser Team*, *Killing Hasselhoff*, *Scramble* and in

advertising campaigns for Skyy Vodka, Miller Lite, Michelob Ultra, Bacardi, Sisley & Detour,

St. Pauli Girl, and Constellation. Doc. 111, 56. She remembers that, in 2015, she had

approximately 2,200,000 Facebook followers, 300,000 Instagram followers, and 75,000 Twitter

followers. *Id.* at 56–57.

Voronina's picture comes from a photography shoot for Leg Avenue from sometime

between 2008 and 2009. Doc. 111, 58. During discovery, Defendants introduced contracts

between Voronina and Leg Avenue that had been produced by Voronina in other lawsuits. Doc.

105-29, 68–69. The release provided that Voronina "irrevocably assign[ed] to Leg

Avenue . . . the unrestricted rights to copyright, use, publish, sell, or distribute images of me

which it has had taken this day." Doc. 112-1, 89. The pictures of Voronina were posted on

January 8, 2014. Doc. 1-4, 4.

**16. Gaxiola**

Gaxiola, a former Miss Cuba, has appeared in *GQ*, *Maxim* (Australia), *Open*, *Esquire*,

and in advertising campaigns for Reebok, Hurley, Guess Jeans, Victoria Secret, Nike, MAC

Cosmetics, Roberto Cavalli, Naeem Khan, Paul Marciano, Fendi, Saks Fifth Avenue, Nieman

Marcus and the Ultimate Fighting Championship. Doc. 111, 59. She remembers having

approximately 125,000 Instagram followers in 2015, and does not recall how many social media followers she had in 2014. Doc. 105-30, 137–138.

Gaxiola's picture comes from a photography shoot with Leg Avenue in 2009 or 2010. Doc. 111, 60–61. Gaxiola testified that she signed a release but that she did not have a copy of the release. Doc. 105-30, 20. The picture of Gaxiola was posted on January 1, 2014. Doc. 1-4, 6.

**17.    Vickers**

Vickers has appeared in *WEE: NXT*, *WWE: Smackdown*, and *A Fine Step*. Doc. 111, 46. She has also appeared at events for NASCAR, NHRA, the International Auto Show, the NBA, the Future Business Leaders of America, and Florida Cattlewomen's Association. *Id.* She remembers that, in 2015, she had approximately 60,000 Facebook followers, 4,500 Instagram followers, and 12,000 Twitter followers. *Id.* at 46–47. She testified that she did not remember how many social media followers she had in 2014. Doc. 105-31, 101.

The picture of Vickers was taken for a professional photography shoot in approximately 2010. Doc. 105-31, 23–25. Vickers was "sure" that she published the picture on Facebook, may have shared it on Model Mayhem, Twitter, and Maxim.com. *Id.* at 23–28. She did not recall whether she signed a release with *Maxim*. *Id.* at 28–29. The picture of Vickers was posted on April 6, 2014. Doc. 1-4, 8.

**18.    Rosario**

Rosario has appeared in *Maxim*, *FHM*, *GQ*, *Vogue*, and in advertising campaigns for Budweiser, Comcast, Monster Energy Drinks, and Protein World. *Id.* at 49. She remembers having approximately 2,000,000 Facebook followers, 1,000,000 Instagram followers, and 80,000 Twitter followers in 2015. *Id.* She testified that she did know how many followers she had in

2014. Doc. 105-32, 41–42. Rosario took the picture at issue in the instant action. Doc. 111, 51. She did not give anyone permission or authority to use the picture. *Id.* The picture of Rosario was posted on April 10, 2014. Doc. 1-4, 10.

**19.    Skinner**

Skinner has appeared in *The Tonight Show with Jay Leno*, *Rules of Engagement*, *QVC*, *Shark*, *Las Vegas "White Christmas," CSI Miami*, *Maxim*, *Maxim* (Spain), *Maxim* (Belgium), *FHM*, *Muscle & Fitness*, and Def Leppard's "Nine Lives." Doc. 111, 51. She has also appeared in advertising campaigns for Sketchers, Nordstrom, Fredericks of Hollywood, Tecate, and Skyy Vodka. *Id.* She recalls that in 2015, she had approximately 2,600 Facebook followers, 90,000 Instagram followers, and 3,700 Twitter followers. *Id.* She testified that she did not know how many followers she had in 2012. Doc. 105-33, 79.

The pictures of Skinner come from photography shoots for *Dreamgirl* and *Savvy* from 2006 to 2010. Doc. 111, 53. Skinner testified that she signed a "type of release" or other documents with *Dreamgirl*. Doc. 105-33, 46. She also testified that she did not sign any contracts or releases with *Savvy* Magazine related to the article and the publication of her image. *Id.* at 59–60. The pictures of Skinner were posted on November 24, 2012, January 16, 2014, and January 24, 2014. Doc. 1-4, 12–14.

**20.    Whitten**

Whitten has appeared in *Maxim*, *Super Street*, *Modified Magazine*, *DSport*, *Pasmag*, and *Super Street Bike*, as well as advertising campaigns for Nos Energy Drink and Dodge. Doc. 111, 41. She remembers that in 2015 she had approximately 40,000 Facebook followers and 30,000 Instagram followers. *Id.* She testified that she did not know how many followers she had in 2013. Doc. 105-34, 136.

The picture of Whitten is a picture that she took of herself during a 2010 photography shoot for either *Super Street* or *Imports*. Doc. 105-34, 30–31. Whitten testified that she posted the picture on her social media accounts but that she did not publish it anywhere else. *Id.* at 32. The picture of Whitten was posted on January 27, 2013. Doc. 1-4, 16.

**B.      Damages**

Plaintiffs have not identified any engagement or other business opportunity that they did not receive due to Defendants' alleged misappropriation of their images. Doc. 108, 55. It is also undisputed that Plaintiffs have not presented any evidence that their income as a model and/or actress decreased after, or as a result of, Defendants' social media posts. Doc. 108, 55. Finally, it is undisputed that Burciaga, Hinton, Krupa, Wilcox, Underwood, Weber, and Selby have voluntarily associated themselves with similar clubs in the past and that none of the Plaintiffs were aware of any ridicule connected with the use of their images in the social media posts in question. Doc. 108, 56.

**C.      Procedural History**

On September 11, 2015, Plaintiffs' counsel sent a cease and desist letter to the SCE Group. Doc. 111, 68. Plaintiffs filed a complaint on October 16, 2015. Doc. 1. The complaint alleged false endorsement under the Lanham Act, civil rights violations under New Yok State law, deceptive trade practices, defamation, negligence and respondent superior, conversion, unjust enrichment, and quantum meruit. Doc. 1, 27–35.

On July 6, 2016, Defendants filed a third-party complaint against Creative Complex, Inc., LR Graphics, LLC, d/b/a Sikgrfx, Luis Ramirez, and Pixel Robot, LLC. Doc. 23.[8]  This third-

---

[8] On January 25, 2019, Plaintiffs filed a stipulation of voluntary dismissal against Lambros Mumouris, the owner of SCE Group. Doc. 94.

party complaint is not at issue here. On that same day, Defendants and Plaintiffs cross-moved for summary judgment. Doc. 95, 99.

## II.    Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F.Supp.2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* (internal quotation marks omitted). The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Med. Ctr.*, 706 F.Supp.2d 494, 504 (S.D.N.Y. 2010) (internal quotation marks omitted) (citing *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)). However, "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

"When confronted with cross-motions for summary judgment, the Court analyzes each motion separately, 'in each case construing the evidence in the light most favorable to the non-moving party.'" *Peterson v. Kolodin*, No. 13 Civ. 793 (JSR), 2013 WL 5226114, at *1 (S.D.N.Y. Sept. 10, 2013) (quoting *Novella v. Westchester Cty.*, 661 F.3d 128, 139 (2d Cir.

2011)); *see also Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) ("[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration.") (citation omitted). The Court is not required to resolve the case on summary judgment merely because all parties move for summary judgment. *Morales*, 249 F.3d at 121.

## III.    Discussion[9]

Plaintiffs bring false endorsement, right to privacy, deceptive acts, and defamation claims under federal and state law.

## A.    False Endorsement under § 43(A) of the Lanham Act

Section 43 of the Lanham Act prohibits the use of a protected mark in a way that is likely to cause consumer confusion "as to the origin, sponsorship, or approval of [defendants'] goods." 15 U.S.C. § 1125 (a)(1)(A). To bring a false endorsement claim, Plaintiffs must show that Defendants, "(1) in commerce, (2) made a false or misleading representation of fact (3) in connection with goods or services (4) that is likely to cause consumer confusion as to the origin, sponsorship, or approval of the goods or services." *Toth v. 59 Murray Enterprises, Inc.*, No. 15 Civ. 8028 (NRB), 2019 WL 95564, at *5 (S.D.N.Y. Jan. 3, 2019) (internal quotation marks and citation omitted). Because Defendants used Plaintiffs' pictures to advertise their commercial establishments, there is no dispute about the first and third prong of the test. The Court addresses the second and fourth prongs below.

---

[9] Defendants argue that Mayes and Pepaj have released their claims but, as explained above, they have not provided any evidence that the releases that they reference cover the images at issue.

## 1. False or Misleading Representation of Fact

Plaintiffs here never endorsed Defendants. As a result, the second element turns on whether the social media posts imply that Plaintiffs endorsed Defendants. *Beastie Boys v. Monster Energy Co.*, 66 F. Supp. 3d 424, 449 (S.D.N.Y. 2014) ("The [plaintiffs] undisputedly never endorsed [defendant]. The first Lanham Act element therefore turned on whether the video implied that the [plaintiffs] had done so, because any such implication was necessarily false."). This inquiry consists of two questions: Do the posts contain an endorsement of Defendants? And if so, is that endorsement fairly attributed to Plaintiffs? *Id.*[10]

As to the first question, the answer is yes. It is undisputed that Defendants made these posts, or instructed the third-party advertisers to create them, to promote their business. Doc. 111, 68. Each appears on a social media page that prominently displays Defendants' name and most advertise an event at one of Defendants' location.

As to the second question, the answer is also yes. These endorsements imply an association between Plaintiffs and Defendants because they juxtapose Plaintiffs' pictures with

---

[10] In false advertising cases, courts consider whether a statement is literally or impliedly false. *Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*, 843 F.3d 48, 65 (2d Cir. 2016). "To establish literal falsity, a plaintiff must show that the advertisement either makes an express statement that is false or a statement that is false by necessary implication, meaning that the advertisement's words or images, considered in context, necessarily and unambiguously imply a false message." *Id.* (internal quotation marks and citation mitted). "If a message is not literally false, a plaintiff may nonetheless demonstrate that it is impliedly false if the message leaves an impression on the listener or viewer that conflicts with reality." *Id.* (internal quotation marks omitted). In false advertising cases, this distinction matters because if a statement is literally false, a court may enjoin it without considering its impact on customers. *Id.* This case law, however, is not particularly relevant here because it is unclear whether this framework applies to false endorsement claims. *Toth*, 2019 WL 95564, at *5 ("But whether a representation is literally or impliedly false is a question traditionally addressed within the context of false advertising claims brought under 15 U.S.C.A. § 1125 (a)(1)(B), not in the context of false endorsement claims brought under subsection (A) of the section"). More importantly, injunctive relief is not at issue here because Defendants have already removed the challenged posts. However, to the extent that this framework does apply to false endorsement claims that only seek damages, the Court finds, as explained below, that the posts are not literally false because they are open to interpretation.

text referencing Defendants' clubs.  Furthermore, a number of the posts describe the women,

though not by name, who perform at the clubs directly under Plaintiffs' picture, and therefore

imply that Plaintiffs are the women that the posts describe.[11]

## 2.    Consumer Confusion

The parties dispute whether the use of Plaintiffs' images caused consumer confusion.  To

resolve this debate, the Court considers the "(1) strength of the trademark; (2) evidence of actual

consumer confusion; (3) evidence that the imitative mark was adopted in bad faith; (4) similarity

of the marks;[12] (5) proximity of the products and their competitiveness with one another; and

(6) sophistication of consumers in the relevant market." *Toth*, 2019 WL 95564, at *6.  In

applying this test, the Court is mindful that "[n]o single factor is dispositive" and that "each

factor must be evaluated in the context of how it bears on the ultimate question of likelihood of

confusion . . . ." *Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 130 (2d Cir. 2004).[13]

### a.  Strength of the Mark

This is a false endorsement case—not a false advertising case.  In this context, the Court,

like other courts in this District, interprets the strength of the mark to mean "the level of

recognition the celebrity has among the segment of the public to whom the goods are

advertised." *Bruce Lee Enterprises, LLC v. A.V.E.L.A., Inc.*, No. 10 Civ. 2333 KMW, 2013 WL

822173, at *20 (S.D.N.Y. Mar. 6, 2013).  "[T]he misappropriation of a completely anonymous

---

[11] By way of example, some of the posts use the following language:  "#hottest#bartenders&#waitresses;" "Hottest Dancers, Waitresses, & Bartenders in #NewYork;" "New York's Hottest Dancers, Waitresses, & Bartenders;" "Come#Watch our #Gorgeous #Strippers#Waitress&#Bartender Staff."  Doc.1-1, 3,10, 12, 14, 18, 20, 22.

[12] The parties agree that the marks are similar.  Doc. 110, 12.

[13] The Court need not analyze the similarity prong, the fourth factor, because the parties agree that this factor favors Plaintiffs.  Doc. 96, 13.

face could not form the basis for a false endorsement claim, because consumers would not infer that an unknown model was 'endorsing' a product, as opposed to lending her image to a company for a fee." *Bondar v. LASplash Cosmetics*, No. 12 Civ. 1417 SAS, 2012 WL 6150859, at *7 (S.D.N.Y. Dec. 11, 2012). Courts within this District have identified Carmen Electra,[14] Drake,[15] Woody Allen,[16] Nolan Ryan,[17] and 50 Cent,[18] as examples of celebrities with strong marks.

Other courts have held that lesser known people have not had sufficiently strong marks. In *Toth*, the court held that a number of models, including Plaintiffs herein Hinton, Weber, and Mayes, had failed to produce evidence that they actually garnered recognition for any of their appearances, even though, like the Plaintiffs here, they had participated in promotional campaigns for a wide variety of brands and appeared in magazines, television shows, and movies. *Toth*, 2019 WL 95564, at *7.[19] In *Pelton*, the court held that a model did not have a

---

[14] *Toth v. 59 Murray Enterprises, Inc.*, No. 15 Civ. 8028 (NRB), 2019 WL 95564, at *7 (S.D.N.Y. Jan. 3, 2019) (finding that "Electra has offered persuasive evidence of the strength of her mark" because "Electra's uncontroverted resume establishes that she has not just appeared in popular movies and television shows, but had regular and starring roles in them").

[15] *Estate of Smith v. Cash Money Records, Inc.*, No. 14 Civ. 2703, 2018 WL 2224993, at *7 (S.D.N.Y. May 15, 2018) (finding that the musical artist had a strong mark because he was "one of this decade's most popular musical artists, making him instantly recognizable to most Americans").

[16] *Allen v. Nat'l Video, Inc.*, 610 F. Supp. 612, 627 (S.D.N.Y. 1985) (finding that "Plaintiff's 'mark', to analogize from trademark law, is a strong one" because "[t]here is no dispute that plaintiff's name and likeness are well-known to the public, and that he has built up a considerable investment in his unique, positive public image.").

[17] *Ryan v. Volpone Stamp Co.*, 107 F. Supp. 2d 369, 400 (S.D.N.Y. 2000) (finding that the baseball player had a strong a mark because he was "a former Major League Baseball pitching sensation and Hall of Fame inductee").

[18] *Jackson v. Odenat*, 9 F. Supp. 3d 342, 358 (S.D.N.Y. 2014) (finding that the musician had a strong mark because he "sold over 25 million copies of his albums" and "[h]e has also been nominated thirteen times for a Grammy Award.").

[19] The Court recognizes that at least one court within this District has ended the analysis there and has collaterally estopped a plaintiff from asserting identical Lanham act claims against a new defendant after previously losing on an analogous case. *See Yamaha Int'l Corp. v. Cent. Venture, Inc.*, No. 86 Civ. 9495 (JFK), 1995 WL 507292, at *2 (S.D.N.Y. Aug. 28, 1995) (collaterally estopping a plaintiff from litigating an issue for a sixth time in a fourth jurisdiction). The Court decides not to use this equitable power. The Court applies New York law and under New York law, collateral estoppel is appropriate "if the issue in the second action is identical to an issue which was

strong mark because "[o]ne appearance in a Sports Illustrated Swimsuit Issue in 1984 and some advertising work for well-known consumer products does not deliver celebrity status." *Pelton v. Rexall Sundown, Inc.*, No. 99 Civ. 4342 JSM, 2001 WL 327164, at *3 (S.D.N.Y. Apr. 4, 2001). In *Albert*, the court dismissed a model's false endorsement claim because the model did "not claim that he [wa]s well known or a celebrity, a fact corroborated by the $150 fee he received for posing for the *Consumer Reports* advertisement." *Albert v. Apex Fitness, Inc.*, No. 97 Civ. 1151 (LAK), 1997 WL 323899, at *1 (S.D.N.Y. June 13, 1997).

Plaintiffs have not provided any survey that directly shows general consumer recognition or specific recognition by Defendants' customers. Doc. 106, 16. Instead, they rely on Plaintiffs' resumes and their social media accounts. Their resumes vary considerably. Some have millions of followers and others have a few thousand. Based on their resumes and in the absence of a consumer survey, however, the Court cannot conclude that any of them have attained the level of celebrity that other courts in this Circuit have considered to constitute strong marks.[20] Instead, the evidence establishes that they are as recognizable as the parties that prior courts have held to have relatively weak marks. As a result, this factor weighs in favor of Defendants.

---

raised, necessarily decided and material in the first action, and the plaintiff had a full and fair opportunity to litigate the issue in the earlier action." *LaFleur v. Whitman*, 300 F.3d 256, 271 (2d Cir. 2002). Defendants have not provided the Court with the disputed advertisements in the previous case. As a result, the Court cannot determine whether the previous case raised identical issues to those raised in the instant case. In the absence of this evidence, collateral estoppel would be imprudent.

[20] Plaintiffs argue that they have strong marks because they have received payment for modeling in the past, Doc. 106, 11–13, yet, courts in this District have repeatedly held that models, including some of the Plaintiffs, lacked strong marks for false endorsement claims. Plaintiffs also argue that their marks must be strong because other businesses have used their images without permission. Doc. 106, 13. This could be true but it could also be true that other businesses have used their images without permission because they were anonymous and because the businesses did not realize that anyone had ownership rights in them. Such speculation, however, is inappropriate on summary judgment. *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008) ("conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment").

**b. Evidence of Actual Confusion**

In order to prove actual consumer confusion, plaintiffs typically provide either direct testimony from confused consumers or indirect evidence of consumer confusion in the form of surveys. *Mattel, Inc. v. Azrak-Hamway Int'l, Inc.*, 724 F.2d 357, 361 (2d Cir. 1983). "Although the absence of surveys is evidence that actual confusion cannot be shown, a trier of fact may still conclude that actual confusion exists in the absence of such evidence, so long as there is other evidence of actual confusion." *The Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 964 (2d Cir. 1996) (internal quotation marks and citations omitted). Here, Plaintiffs have provided no evidence of consumer confusion in the form of either actual confusion or expert testimony about a survey of costumers. Instead, they focus on the Defendants' intention, the next factor addressed below. Doc. 106, 14–16. As a result, this factor weighs in favor of Defendants.

**c. Bad Faith**

"Under this factor, we look to whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *The Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 964 (2d Cir. 1996) (internal quotation marks and citations omitted). On one hand, "[s]election of a mark that reflects the product's characteristics, request for a trademark search and reliance on the advice of counsel are factors that support a finding of good faith." *Lang v. Ret. Living Pub. Co.*, 949 F.2d 576, 583 (2d Cir. 1991). On the other hand, "[t]his Court has never held adoption of a mark with no knowledge of a prior similar mark to be in bad faith even in the total absence of a trademark search, much less on the basis of an allegedly flawed trademark search." *Star Indus., Inc. v.*

*Bacardi & Co.*, 412 F.3d 373, 388 (2d Cir. 2005). However, "[b]ad faith may be inferred from the junior user's actual or constructive knowledge of the senior user's mark." *Id.* at 389.

Here, Drakopoulos testified that he did not know the names of any of the Plaintiffs when the pictures were published and that, prior to becoming aware of the lawsuit, he had not heard of any of the Plaintiffs in this suit. Doc. 105-5, 37–38, 191. He further testified that Defendants searched for the pictures by theme, such as "sexy girl in a military outfit," and not by any term unique to the featured model. Doc. 108, 33. Plaintiffs have not pointed to any evidence that Defendants were constructively aware of Plaintiffs' celebrity or reputation before the pictures were posted on their social media sites. This factor weighs in favor of Defendants.[21]

### d. Proximity and Competitiveness of Products

"The proximity inquiry asks to what extent the two products compete with each other" and "[i]n assessing product proximity we look at the nature of the products themselves and the structure of the relevant market." *Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 134 (2d Cir. 2004). Specifically, the courts look at "market proximity" and "geographic proximity." *Id.* "Both elements seek to determine whether the two products have an overlapping client base that creates a potential for confusion." *Id.*

Courts within this District have found that products competed when they sought to appeal to the same customers, such as movie watchers, *Allen v. Nat'l Video, Inc.*, 610 F. Supp. 612, 628 (S.D.N.Y. 1985), and hip-hop fans, *Jackson v. Odenat*, 9 F. Supp. 3d 342, 358 (S.D.N.Y. 2014). Importantly, in *Toth*, the court held that the models, including three Plaintiffs here, and a gentlemen's club competed for the same market because, as defendants in that case conceded,

---

[21] For the posts made by the third-party advertisers, this factor weighs even more heavily in favor of Defendants because Defendants relied on that third party's representation that it purchased all of the pictures featured in their posts. Doc. 105-5, 135–137.

both "sold" women's appearances. 2019 WL 95564, at *10. However, in *Naked Cowboy v. CBS*, another court within this District found that a Times Square performer and a daytime television program did not compete for the same customers because the television program was "watched by millions of people across the country" and the plaintiff's "performances [were] heavily concentrated in the New York City area." 844 F. Supp. 2d 510, 517 (S.D.N.Y. 2012).

In the instant case, Defendants do not concede that they and Plaintiffs compete for the same costumers. Although Plaintiffs and Defendants both market women's appearances, there is no evidence in the record that Plaintiffs and Defendants target the same geographic markets. Defendants operate clubs in New York and some Plaintiffs have many followers on social media. While one may logically assume that at least some of Plaintiffs' followers live in New York, it is not established in the record. This factor is neutral.

### e. Sophistication of Consumers

Generally, "Our analysis of consumer sophistication consider[s] the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *Star Indus.*, 412 F.3d at 390 (internal quotation marks and citations omitted). However, consumer sophistication may be proved by direct evidence such as expert opinions or surveys and "in some cases a court is entitled to reach a conclusion about consumer sophistication based solely on the nature of the product or its price." *Id.* "The more sophisticated the consumers, the less likely they are to be misled by similarity in marks." *TCPIP Holding Co. v. Haar Commc'ns, Inc.*, 244 F.3d 88, 102 (2d Cir. 2001).

In determining consumer sophistication, courts consider the product's nature and price. This is because "[t]he ordinary purchaser of bread and margarine is a casual buyer, and the

bustling, self-service atmosphere of a typical supermarket makes careful examination of products unlikely." *Lever Bros. Co. v. Am. Bakeries Co.*, 693 F.2d 251, 259 (2d Cir. 1982). Along the same lines, confusion is more likely "where inexpensive products are involved, since the normal buyer does not exercise as much caution in buying an inexpensive article as he would for a more expensive one." *Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc.*, 281 F.2d 755, 762 n.19 (2d Cir. 1960).

Here, Defendants argue that the consumers are sophisticated because of their wealth and income. Doc. 96, 29. Plaintiffs argue that they are sophisticated because of their desire to see attractive women. Doc. 106, 22. Neither interpretation of sophistication tracks the Second Circuit case law, which focuses on the product's nature and price. In any event, because the parties agree that the consumers are sophisticated, this factor weighs in favor of Defendants.

**f. Balancing of the Factors**

As explained above, four of the six factors favor Defendants. The Court finds that Plaintiffs have not established a false endorsement claim.

**g. Monetary Damages, Fees, and Costs**

"Plaintiffs normally have a greater burden in attempting to establish entitlement to damages for violation of section 43(a)." *PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc.*, 818 F.2d 266, 271 (2d Cir. 1987) *abrogated on other grounds*, as recognized in *Hannex Corp. v. GMI, Inc.*, 140 F.3d 194, 206 n. 9 (2d Cir.1998). Specifically, "[t]hey must establish actual consumer confusion or deception resulting from the violation." *Id.* Similarly, the Second Circuit "has explicitly stated that [the Lanham Act] allows recovery of a reasonable attorney's fee only . . . on evidence of fraud or bad faith." *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 194 (2d Cir. 1996). Finally, "[t]he Court maintains a wide field of equitable discretion in

determining whether to award a party costs." *Toth*, 2019 WL 95564, at *10. For the reasons stated above, Plaintiffs have failed to provide evidence of actual consumer confusion or bad faith. As a result, their requests for monetary relief, fees, and costs are denied.

**B.    N.Y. Civil Rights Law §§ 50-51[22]**

Plaintiffs bring a claim under Civil Rights Laws §§ 50-51. New York does not recognize a common-law right of privacy. *Messenger ex rel. Messenger v. Gruner + Jahr Printing & Pub.*, 727 N.E.2d 549, 551 (N.Y. 2000). Instead, New York recognizes a limited statutory right to privacy. "Section 50 makes it a misdemeanor to use a living person's name, portrait or picture for advertising or trade purposes without having first obtained the written consent of such person . . . ." *Id.* (internal quotation marks omitted). Section 51 provides,

> Any person whose . . . picture . . . is used within this state for advertising purposes . . . without the written consent . . . may maintain an equitable action in the supreme court of this state against the . . . corporation so using his . . . picture . . . to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use . . . .

N.Y. Civ. Rights Law § 51. If the defendant knowingly used such person's picture in such a prohibited manner, the jury, in its discretion, may award exemplary damages. *Id.* Importantly, an action to recover damages for a violation of § 51 must be brought within one year. *Nussenzweig v. diCorcia*, 878 N.E.2d 589, 590 (N.Y. 2007). "[T]he statute of limitations on Civil Rights Law §§ 50 and 51 claims runs from the date of the most recent violations of the statute." *Id.*

Given New York's one-year statute of limitations for defamation claims, all publications

---

[22] "Plaintiffs acknowledge that N.Y. Civil Rights Law §50-51 preempts their common law claims for negligence, conversion, unjust enrichment and quantum meruit." Doc. 106, 28 n. 21.

made before October 16, 2014, are barred. According to the timestamps on Plaintiffs' evidence, all but two pictures were published before October 16, 2014: a picture of Burciaga was published on approximately April 21, 2015, and a picture of Mayes was published on approximately February 10, 2015. In addition, a picture of Hinton and a picture of Guerra were published on unknown dates.

Defendants argue that Plaintiffs admitted that all pictures of Mayes, Hinton, and Guerra were published before October 16, 2014. Defendants sent Plaintiffs their requests for admission that the pictures of Mayes, Hinton, and Guerra were published before October 15, 2014. Plaintiffs did not respond to these requests within 30 days. Defendants claim that, as a result, pursuant to Federal Rule of Civil Procedure 36(a)(3), the facts were admitted. Fed. R. Civ. P. 36(a)(3). Plaintiffs argue that this Rule does not apply because Rule 36(b) provides that "[a] matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended." Fed. R. Civ. P. 36(b). *See also Local Union No. 38, Sheet Metal Workers' Int'l Ass'n, AFL-CIO v. Tripodi*, 913 F. Supp. 290, 294 (S.D.N.Y. 1996) ("the failure to respond in a timely fashion does not require the court automatically to deem all matters admitted."). Plaintiffs correctly quote Rule 36(b), however, they have not submitted a motion to amend or withdraw their admission. Therefore, the Court finds that Plaintiffs have admitted the fact that the pictures of Mayes, Hinton, and Guerra were published before August 15, 2014.

For the picture of Burciaga, there is no dispute that Defendants used her picture for advertising purposes and that Defendants never sought permission to use her image to advertise, promote, market or endorse Defendants' clubs. Doc. 111, 4. As a result, the Court grants

summary judgment on this claim as to the non-time barred picture of Burciaga.[23] Because

Plaintiffs have not provided any evidence of a knowing violation of § 51,[24] and because

Defendants have already removed the challenged picture, only compensatory damages are

available. Compensatory damages are "the fair market value of the use for the purposes of trade

of [her] face, name and reputation." *Grant v. Esquire, Inc.*, 367 F. Supp. 876, 881 (S.D.N.Y.

1973).

## C.    New York General Business Law § 349

Plaintiffs bring a claim under N.Y. Gen. Business Law § 349. "To make out a prima

facie case under Section 349, a plaintiff must demonstrate that (1) the defendant's deceptive acts

were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff

has been injured as a result." *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000). "[T]he

gravamen of the complaint must be consumer injury or harm to the public interest." *Securitron*

*Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995) (internal quotation marks and

citation omitted). As a result, "[p]rivate contract disputes, unique to the parties, for example,

would not fall within the ambit of the statute." *Oswego Laborers' Local 214 Pension Fund v.*

*Marine Midland Bank, N.A.*, 647 N.E.2d 741, 744 (N.Y. 1995).

"The overwhelming majority of courts in this Circuit have concluded that the general

variety of consumer confusion that is the gravamen of [a false endorsement] claim is an

insufficient harm to the public interest for purposes of NYGBL § 349." *Toth v. 59 Murray*

---

[23] Defendants claim that the Court must assume that Burciaga, in the absence of evidence of a specific release, consented to being portrayed in the advertising campaign. Doc. 110, 28. Defendants have not provided any support for this claim.

[24] It is undisputed that Drakopolous testified that Defendants "had no reason to think [they] had to obtain any rights on any image that's free on the Internet" and that it was his understanding that any image on the internet can be used for commercial purposes. Doc. 111, 67.

*Enterprises, Inc.*, No. 15 Civ. 8028 (NRB), 2019 WL 95564, at *13 (S.D.N.Y. Jan. 3, 2019) (internal quotation marks omitted). *See New York Univ. v. Cont'l Ins. Co.*, 662 N.E.2d 763, 771 (N.Y. 1995) (finding that the statute did not cover misrepresentations made by an insurance company to a university); *RCA Trademark Mgmt. S.A.S. v. VOXX Int'l Corp.*, No. 14 Civ. 6294 (HBP), 2015 WL 5008762, at *1 (S.D.N.Y. Aug. 24, 2015) (finding that consumer confusion, in itself, did not satisfy the public harm requirement); *C=Holdings B.V. v. Asiarim Corp.*, 992 F. Supp. 2d 223 (S.D.N.Y. 2013) (same); *Merck Eprova AG v. Brookstone Pharm., LLC*, 920 F. Supp. 2d 404 (S.D.N.Y. 2013) (finding that the plaintiff had not alleged sufficient public harm because the public harms—consumer confusion and unsupported allegations of negative health effects—were not core to plaintiff's claim); *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 277 F. Supp. 2d 269, 274 (S.D.N.Y. 2003) (finding that a trademark infringement claim between competitors constitutes a public harm "too insubstantial" to satisfy the pleading requirements of § 349). *But see Casper Sleep, Inc. v. Mitcham*, 204 F. Supp. 3d 632, 644 (S.D.N.Y. 2016) (holding that a claim satisfied the first prong of the test because the promotion was "plainly geared toward consumers.").[25]

Here, the "gravamen" of Plaintiffs' complaint is their private dispute with Defendants about whether or not Defendants should have used their pictures without their consent. The complaint does not discuss consumer injury or harm to the public interest. The Court notes that it is the third court within a little over a year to deny this claim under the New York Business Law when brought by the same lawyer on behalf of some of the same plaintiffs. *See Toth*, 2019

---

[25] *See also Consumer Fin. Prot. Bureau v. RD Legal Funding*, LLC, 332 F. Supp. 3d 729, 782 (S.D.N.Y. 2018) ("the averments in the Complaint indicate that Defendants' conduct was 'consumer-oriented' in that Defendants made similar statements and representations to all of the Consumers targeted."). The Court will not follow this minority view.

WL 95564, at *14 (granting summary judgment in favor of club and against models because the models "do not allege an injury to the public interest above and beyond the general variety of consumer confusion" (internal quotation marks omitted)); *Mayes v. Summit Entm't Corp.*, 287 F. Supp. 3d 200, 211 (E.D.N.Y. 2018) (finding that "Plaintiffs' allegations are plainly insufficient to support a claim under Section 349" even though "Plaintiffs allege that the publication of their images 'was misleading in a material respect because it created the impression that Plaintiffs were strippers working at the Clubs, or endorsed the Clubs.'").[26]

## D.  Defamation

"Defamation is the injury to one's reputation either by written expression, which is libel, or by oral expression, which is slander." *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 456 (S.D.N.Y. 2012) (quoting *Idema v. Wager*, 120 F. Supp. 2d 361, 365 (S.D.N.Y. 2000), aff'd, 29 F. App'x 676 (2d Cir. 2002)). Under New York law, a defamation claim must allege "(1) a false statement about the [complainant]; (2) published to a third party without authorization or privilege; (3) through fault amounting to at least negligence on [the] part of the publisher; (4) that either constitutes defamation per se or caused 'special damages.'" *Fuji Photo Film U.S.A., Inc. v. McNulty*, 669 F. Supp. 2d 405, 411 (S.D.N.Y. 2009) (alterations in original) (quoting *Gargiulo v. Forster & Garbus Esqs.*, 651 F. Supp. 2d 188, 192 (S.D.N.Y. 2009)).

A defamatory statement "exposes an individual 'to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or . . . induce[s] an evil opinion of one in the minds of right-thinking persons, and . . . deprives one of . .

---

[26] Defendants further argue that Plaintiffs' claims must fail because they have failed to introduce facts that Defendants intended to deceive customers. Doc. 96, 35–36. The Court of Appeals has rejected attempts to add a scienter requirement to § 349: "[I]t is not necessary under the statute that a plaintiff establish the defendant's intent to defraud or mislead." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 745 (N.Y. 1995).

. confidence and friendly intercourse in society.'" *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 177 (2d Cir. 2000) (alteration in original) (quoting *Kimmerle v. N.Y. Evening Journal*, 186 N.E. 217, 218 (N.Y. 1933)).

Importantly, "[t]he statute of limitations for libel in New York is one year" and "New York's single publication rule states that a defamation claim accrues at publication, defined as the earliest date on which the work was placed on sale or became generally available to the public." *Van Buskirk v. The New York Times Co.*, 325 F.3d 87, 89 (2d Cir. 2003) (internal quotation marks and citations omitted). "Because the statute of limitations is an affirmative defense, the defendant bears the burden of establishing by prima facie proof that the limitations period has expired since the plaintiff's claims accrued." *Overall v. Estate of Klotz*, 52 F.3d 398, 403 (2d Cir. 1995).[27]

### 1. Statute of Limitations

Defendants claim that the statute of limitations bars all images except for the picture of Burciaga. Plaintiffs filed their complaint on October 16, 2015. Doc. 1. Given New York's one-year statute of limitations for defamation claims, all publications made before October 16, 2014, are barred. As explained above, this one-year statute of limitations bars all defamation claims but those arising from the picture of Burciaga.

### 2. False Statement

Defendants argue that they have not made any false statements because the post of Burciaga does not name her, state that she would appear at the Club or alter her image in any

---

[27] Plaintiffs assert that they tolled the statute of limitations when they sent Defendants a cease and desist letter. Doc. 106, 31. They, however, do not cite a single case for this proposition.

way. Doc. 96, 37. New York courts, however, have long held that, in certain circumstances, pictures of unidentified individuals can qualify as false statements. *Morrison v. Smith*, 69 N.E. 725, 727 (N.Y. 1904) (finding that it was a false statement to use a woman's picture to advertise a biographical book that was, in fact, not about her); *Fils-Aime v. Enlightenment Press, Inc.*, 507 N.Y.S.2d 947, 949 (App. Term 1986) ("the plaintiff had no connection with the subject matter of the article, and the juxtaposition of her photograph with the article was obviously false and misleading."); *De Figuerola v. McGraw-Hill Pub. Co.*, 74 N.Y.S.2d 448, 451 (Sup. Ct. 1947), *aff'd sub nom. De Figuerola v. McGraw-Hill Publ'g Co.*, 78 N.Y.S.2d 197 (App. Div. 1948) ("it was held libelous to use plaintiff's picture in connection with an article concerning another person"). The post at issue qualifies as a false statement because it includes a picture of Burciaga and the following statements: "Come celebrate the start of your week with all of our hot new girls!" Doc. 1-1, 24. Read together, the image and the text falsely imply that Burciaga is one of the Club's "hot new girls."

### 3. Defamatory Statement

Two courts within this District have held that using a model's picture in promotional materials for a club does not amount to a defamatory statement. *Toth*, 2019 WL 95564, at *14 ("As one interpretation of the alleged defamatory statements – indeed, the most likely interpretation – is that plaintiffs had simply agreed to appear in the advertisements for a standard modeling fee, we must deny plaintiffs' motion for summary judgment as to the defamation claim"); *Voronina v. Scores Holding Co., Inc.*, No. 16 Civ. 2477 (LAK), 2017 WL 74731, at *6 (S.D.N.Y. Jan. 5, 2017) (noting that "[i]n this case, the alleged libel was that plaintiffs were employed by one or more of the Clubs, that they endorsed one or more of the Clubs, or that they had some affiliation with one or more of the Clubs" and holding "[t]here is nothing defamatory

in and of itself in that implication"). *See also McGraw v. Watkins*, 373 N.Y.S.2d 663 (N.Y. App. Div. 1975) ("a film strip which includes a scene of plaintiff posing in the nude does not necessarily impute unchastity to plaintiff and, therefore, the exhibition thereof by defendant was not libelous per se"). The Court follows these cases and finds that the use of Plaintiffs' images by Defendants does not constitute *per se* defamation.

### 4. Special Damages

Defendants claim that all of Plaintiffs' defamation claims must fail because they have not plead special damages. Doc. 96, 8. To establish special damages, a plaintiff must plead facts demonstrating that actual losses were caused by the alleged tortious act. *Murphy-Higgs v. Yum Yum Tree, Inc.,* 112 F. App'x 796, 797 (2d Cir. 2004); *In Touch Concepts, Inc. v. Cellco P'ship*, 949 F.Supp.2d 447, 484 n.30 (S.D.N.Y. 2013). She must also plead the amount of special damages with specificity. *See Fashion Boutique v. Fendi USA, Inc.,* 314 F.3d 48, 59 (2d Cir. 2002); *Daniels v. St. Luke's-Roosevelt Hosp. Ctr.*, 02 Civ. 9567 (KNF), 2003 WL 22410623, at *8 (S.D.N.Y. Oct. 21, 2003) (plaintiff's special damages claim based on loss of employment and the corresponding salary, were not sufficiently stated as required by New York law); *Rall v. Hellman*, 726 N.Y.S.2d 629 (N.Y. App. Div. 2001) (finding that plaintiff's complaint was deficient because he failed to identify his special damages with sufficient particularity). Plaintiffs claim special damages by simply stating, "[e]ven if Plaintiffs' damages were not presumed, Plaintiffs suffered actual damages by being deprived, at minimum, of the compensation would have been obligated to pay them to be in the Sin City or Show Palace advertisements." Doc. 101, 21. Such conclusory language does not suffice. Furthermore, as Plaintiffs conceded in their response to Defendants' Rule 56.1 Statement of Undisputed Facts, Plaintiffs "have not identified any engagements or assignments they did not get, or did not get

offered, due to Defendants' alleged misappropriation of their images" and "Plaintiffs have not presented any evidence that their income as a model and/or actress went down after, or as a result of, Defendants' social media posts." Doc. 108, 55. As a result, Burciaga has failed to allege special damages.

### 5. Malice

Defendants argue that even if Burciaga has satisfied all other factors, she cannot satisfy the cause factor because she is a "limited purpose public figure" and because limited purpose public figures must prove actual malice to recover under New York's defamation laws.

To qualify as a limited purpose public figure, a defendant must show that the plaintiff has:

> (1) successfully invited public attention to his views in an effort to influence others prior to the incident that is the subject of litigation; (2) voluntarily injected himself into a public controversy related to the subject of the litigation; (3) assumed a position of prominence in the public controversy; and (4) maintained regular and continuing access to the media.

*Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 136–37 (2d Cir. 1984).

It matters whether Burciaga qualifies as a limited purpose public figure because "[i]n order to succeed on their claims, [plaintiffs], as limited purpose public figures, must establish by clear and convincing evidence that the [defendants] published the article with actual malice . . ." *Contemporary Mission, Inc. v. New York Times Co.*, 842 F.2d 612, 621 (2d Cir. 1988)). Under this test, "[l]iability requires clear and convincing evidence of a *knowing* falsehood or subjective awareness of probable falsity." *Id.* at 621. This means that "a finding of actual malice cannot be predicated merely on a charge that a reasonable publisher would have further investigated before publishing." *Herbert v. Lando*, 781 F.2d 298, 308 (2d Cir. 1986). Instead, to prove actual malice, the "plaintiff must show either that the publisher actually entertained serious doubts

about the veracity of the publication, or that there are *obvious* reasons to doubt the veracity of the informant or the accuracy of his reports." *Id.* (internal quotation marks omitted).

In their attempt to carry this burden, Defendants simply write "Ms. Burciaga has successfully and voluntarily invited public attention to her modeling career, which is the subject of this litigation" and that, "[t]herefore, Ms. Burciaga is a limited purpose public figure for the purpose of her modeling career, subjecting her to the heightened actual malice standard." Doc. 96, 38. Although Defendants have only addressed one of the four prongs of this test, Plaintiffs do not challenge the assertion, and, instead, claim that Defendants acted with malice.[28] Plaintiffs have not pointed to evidence that Defendants knew they lacked authority to use Plaintiffs' images or that there were "*obvious* reasons to doubt" their belief that they had authority to use them. Indeed, Drakopoulos testified that Defendants' employee would locate images on the internet and use them only if "there [wa]s no warning or restrictions or anything that says not to use this image." Doc. 105-5, 202. He further testified, "[w]e had no reason to think we had to obtain any rights on any image that's free on the Internet because there's no name, there's no logo on it that says do not use image or copyright or a red or an 'R' or any of the sort." Doc. 105-5, 204–205. As a result, Plaintiffs have not adduced evidence of malice.

## IV.    Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED for all claims except for Burciaga's claim for compensatory damages for the unauthorized use of one picture under Civil Rights Laws §§ 50-51. Plaintiffs' motion for summary judgment is DENIED for all claims except for Burciaga's claim for compensatory damages for the unauthorized use of

---

[28] "Plaintiffs' [sic] agree with Defendants that Burciaga—like all other Plaintiffs—is a public figure . . . ." Doc. 106, 34.

one picture under Civil Rights Laws §§ 50-51. Plaintiffs are directed to submit proposed damages for Burciaga's claim and a memorandum of law in support of that proposal by July 31, 2019. Defendants are directed to respond by August 7, 2019. The Clerk of Court is directed to close the motions, Docs. 95 and 99.

SO ORDERED.

Dated:      July 17, 2019
              New York, New York

Edgardo Ramos, U.S.D.J.