UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CIELO JEAN GIBSON, et. al.,

           Plaintiffs,

– against –

SCE GROUP, INC., d/b/a SIN CITY CABARET, et. al.,

           Defendants.

**OPINION AND ORDER**

15 Civ. 8168 (ER)

RAMOS, D.J.:

    Plaintiffs, twenty models and the sister of a model, brought this action against two clubs, which feature partially nude dancers, because those clubs used Plaintiffs' pictures in advertisements without their consent. Plaintiffs asserted claims for false endorsement under the Lanham Act, civil rights violations under New York State law, and various common law causes of action. Doc. 1, 27–35. The parties cross-moved for summary judgment. Docs. 95, 99. In an Opinion and Order issued July 17, 2019 (the "July 2019 Order"),[1] the Court granted Defendants' motion for summary judgment on all but Jessica Burciaga's claim for compensatory damages for the unauthorized use of one image under New York Civil Rights Law §§ 50–51 ("Section 51"), and otherwise denied the entirety of Plaintiffs' motion. Doc. 123. The Court did not determine damages at that time. Both parties have now briefed the issue of the damages to which Burciaga is entitled. Docs. 129, 130, 131, 140, 141, 142, 143, 144. For the reasons set forth below, the

---

[1] The facts and procedural history of this case are discussed in the July 2019 Order, familiarity with which is presumed. *See Gibson v. SCE Grp., Inc.*, 391 F. Supp. 3d 228 (S.D.N.Y. 2019).

Court finds that Burciaga is entitled to judgment against Defendants, jointly and severally, in the amount of $5,000.[2]

## I.    LEGAL STANDARD

As stated in the July 2019 Order, Burciaga is entitled to compensatory damages for the misappropriation of one image.  Damages for a violation of Section 51 are defined as "the fair market value of the use for the purposes of trade of [her] face, name and reputation."  *Grant v. Esquire, Inc.*, 367 F. Supp. 876, 881 (S.D.N.Y. 1973).  Damages under Section 51 are "a difficult question at best" without objective standards, leaving a considerable degree of discretion with the finder of fact.  *Big Seven Music Corp. v. Lennon*, 554 F.2d 504, 512 (2d Cir. 1977).  However, the fact that damages are difficult to ascertain is not grounds for denying recovery entirely.  *See Electra v. 59 Murray Enterprises, Inc.*, 987 F.3d 233, 256 (2d Cir. 2021).  A judge may act as factfinder to award damages under Section 51.  *See Jones v. Ground Zero Ent.*, No. 05 Civ. 6461 (JSR) (DFE), 2008 WL 11517397, at *2 (S.D.N.Y. Mar. 5, 2008), *report and recommendation adopted*, No. 05 Civ. 6461 (JSR), 2008 WL 11517398 (S.D.N.Y. May 14, 2008) (citing *Big Seven*, 554 F.2d at 513 n.7).

## II.   STATEMENT OF FACTS

The one picture at issue was posted on Instagram by user @sincitycabaret and contains three images of Burciaga in lingerie from three different angles.  Doc. 131-2 at 2.

---

[2] Plaintiffs' request for oral argument, Doc. 132, and Plaintiffs' request for a conference, Doc. 155, are now denied as moot.



The post containing the picture, shown above, was posted to Instagram once, and was captioned as follows:[3]

> Sindustry Mondays are here!!  Come celebrate the start of your week with all of our hot new girls!!  Over 30 entertainers and the sexiest waitresses and bottle girls anywhere in NYC!! $150 bottles and free entry for all Industry personnel.  Two for one bottles for everyone else!!!  We make it hot on a Monday so get down here and start the week right!!  Only @sincitycabaret @czarperez @frankantonio.

---

[3] The image as shown in Doc. 131-2 shows that the picture was posted approximately 15 weeks before August 4, 2015, which is approximately April 21, 2015.

3

*Id.* The tag "sincitycabaret," highlighted by the Court in the image above, appears in the post three times, once above the image of Burciaga and twice in the caption. *Id.* Defendants obtained Burciaga's picture through a Google search. Doc. 131-13 at 4.

This case is one of several that have been brought in recent years where models' images have been misappropriated by strip clubs. *See, e.g.*, *Edmondson v. RCI Hosp. Holdings, Inc.*, No. 16 Civ. 2242 (VEC), 2020 WL 1503452 (S.D.N.Y. Mar. 30, 2020) ("*Edmonson v. RCI*"), *reconsideration denied*, 2020 WL 2731968 (S.D.N.Y. May 26, 2020) ("*Edmonson II*"); *Timed Out, LLC v. Prisma Entertainment, LLC, et. al*, Case No. BC663581 (Cal. Superior Ct., L.A. County, April 10, 2019; *Toth v. 59 Murray Enterprises, Inc.*, No. 15 Civ. 8028 (NRB), 2019 WL 95564 (S.D.N.Y. Jan. 3, 2019), *aff'd in part, vacated in part, remanded sub nom. Electra v. 59 Murray Enterprises, Inc.*, 987 F.3d 233 (2d Cir. 2021); *Edmondson v. Caliente Resorts, LLC*, No. 8:15-CV-2672-T-23TBM, 2017 WL 10591833 (M.D. Fla. Aug. 31, 2017) (resort for swingers); *Gibson v. BTS N., Inc.*, No. 16-24548-CIV, 2018 WL 888872 (S.D. Fla. Feb. 14, 2018). Where liability was found in similar cases, courts have inevitably struggled with the question of what value to place on those misappropriated images, particularly because the models whose images are misappropriated generally have not modeled for such establishments in the past. Here, both parties have retained experts to support their view on the appropriate amount of damages.

### A. Burciaga's Expert, Stephen Chamberlin

Burciaga relies on the expert opinion of Stephen Chamberlin, who concludes that she is entitled to damages in the amount of $160,000. Doc. 131-3. Chamberlin has years of experience as a modeling agent and has served as an expert in similar cases. Doc. 131-1 at 12–14. Chamberlin initially offered an opinion for all Plaintiffs in the case, but after the July 2019

4

Order, he submitted additional Declarations focusing on the damages owed to Burciaga. Doc. 131-3; Doc. 144.

Chamberlin argues that Burciaga is entitled to a rate of $40,000 "per image per usage."[4] Doc. 131-3 ¶ 18. Chamberlin reached this conclusion by "taking into account her payment history, work quality, experience, exposure and duration of career." *Id.* ¶ 14. Chamberlin does not provide specific comparators to support his reasoning. He also explains that, even though generally a premium would be applied for work relating to strip clubs due to a very high embarrassment factor, he has not added such a premium to his valuation in this case. Doc. 144 ¶ 9. However, Chamberlin later confusingly implies that the company would have had to pay a premium to contract with Burciaga for the images at issue. *Id.* ¶¶ 25–26.

Chamberlin then argues that, even though there is only one Instagram post at issue, Burciaga is entitled to compensation for four separate "usages" of her image:

1) **Usage One – Business Name Association:** According to Chamberlin, "included as part of any model's day rate (her time on set) is the right to use her images in advertising, which is generally considered the association of the business's name with the model's image. Here, the name of the business, Sin City Cabaret, is attached to Ms. Burciaga's image three times." Doc. 131-3 ¶ 22. Chamberlin thus argues that the business's name being displayed alongside Burciaga's picture creates an advertisement, constituting one "usage."

2) **Usage Two – Social Media Publishing:** "Defendants published the advertisement on their social media page[], and that internet usage is considered for worldwide consumption and will be considered an additional 'day rate,' as is the practice in the modeling industry, and as made clear, *inter alia*, by the White Book Guide to Models[.]" *Id.* ¶ 23. Chamberlin thus argues that publishing Burciaga's picture on Instagram constitutes a second "usage."

3) **Usage Three – Model as Product:** Chamberlin explains that "unlike a standard modeling job where a model is hired to promote a specific product, the 'product' that Sin City is advertising is Ms. Burciaga herself, because the 'product' strip clubs offer are women who perform naked or partially naked onstage and in private rooms. Sin City promoted . . . Burciaga as being available at their club, as made evident by the language they choose to use in the [caption of the Instagram post containing

---

[4] Chamberlin does not define the terms "image" nor "usage."

   Burciaga's picture]: 'Come celebrate the start of your week with all our hot new girls!!'" This "is considered 'usage branding' because it brands the model as being part of Sin City by implying she works there[.]" *Id.* ¶¶ 24–25. Chamberlin thus argues that the Instagram caption's implication that Burciaga is one of the "hot new girls" is a third "usage."

4) **Usage Four - Coupon:** "Ms. Burciaga's image was also used to promote discounted alcohol sales and free entry, known in the modeling industry as 'Coupon use.'" *Id.* ¶ 26. Chamberlin thus argues that the Instagram caption's inclusion of a discount on alcohol is a fourth "usage."

In support of his argument that models are paid per usage, Chamberlin attaches pages from the "White Book Guide to Models" with no explanation of what the book is, who publishes it, when it was published, or where or how it is used. *Id.* ¶ 23. While the excerpt from the White Book does use the word "usage" to describe the many ways that photographs may be used in advertising, *id.* at 12, it does not provide a comprehensive definition of what qualifies as a use and does not state that separately associating one image with the use of coupons, promoting the model as the product, or associating the business name with the model in one advertisement or internet/social media post would entitle a model to any additional payments. In fact, the White Book says that for "internet usage only," a model would be entitled to a one-day rate. *Id.* at 13. The White Book also does not mention Instagram at all but rather other, arguably dated social media sites.[5] *Id.* at 14. In response, Defendants offer evidence that the White Book has not been published or relied upon for years because it was created by a trade group in England that faced penalties for price fixing and other illegal trade practices. Doc. 141 at 9. Additionally, at her deposition, Burciaga herself could not recall a time when she was paid per usage in the manner her expert, Chamberlin, suggests. Doc. 140-12 at 245:14–19.

   **B. Defendants' Expert, Weston Anson**

---

[5] For example, the White Book refers to "Face Book [sic], Twitter, 4 square [sic], Apps, Blogs, [and] e-mail." Doc. 131-3 at 14.

Defendants' expert, Weston Anson of CONSOR IP Consulting and Valuation, concludes that Burciaga is entitled to damages in the range of $50 to $575.  Doc. 131 Ex. L at 5.  Anson is not a modeling agent, but rather "a seasoned consumer goods marketer," a "branding and licensing expert," and a "pioneer in developing the methodologies that enable accurate valuation of IP on a worldwide basis."  *Id.* at 4.  Anson's opinion is that model contracts are not the appropriate comparator for fair market value; instead, he claims that stock images, generic images available online for paid licensing, are the appropriate measure of value.  *Id.* at 5.  However, he provides no additional support for this argument and does not address whether stock images would actually be available for use in the context of gentlemen's club advertisements.  Burciaga provides evidence that the plain language of Shutterstock's terms of use – one popular website that provides stock images – prohibit the use of its stock photographs in strip club advertisements. [6]  Doc. 131-12 at 6.

### C. Burciaga's Past Contracts

The parties also provided copies of four of Burciaga's past contracts.  Docs. 131-1 at 16–17; 140-13, 140-15, 140-16, 140-17.  The first, provided by Defendants, is a contract with Crazy Horse III Gentlemen's Club in Las Vegas, Nevada that required her to host an event commemorating Mexican Independence Day Weekend in 2014.  Doc. 140-13.[7]  Burciaga was paid a total of ▬▬▬▬ pursuant to the contract and, in addition, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

---

[6] Specifically, Shutterstock's terms of use provide in relevant part:  "RESTRICTIONS ON USE OF VISUAL CONTENT:  YOU MAY NOT:  . . . Portray any person depicted in Visual Content (a 'Model') in a way that a reasonable person would find offensive, including but not limited to depicting a Model:  a) in connection with pornography, 'adult videos,' adult entertainment venues, escort services, dating services, or the like[.]"  Doc. 131-12 at 6.

[7] While Chamberlin, Burciaga's expert, opined that she would be entitled to a premium for the "embarrassment factor" of being associated with a strip club, Burciaga willingly associated herself with this club and is not aware of any ridicule connected with this association.  Doc. 123 at 15.

███████████████████████████████████████.[8] *Id*. In addition to ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. *Id.* In addition, ████████████████████████████████████████████████████████████████████████. *Id.*

The second contract, provided by both parties, concerns Burciaga's tenure as Playmate of the Month in Playboy Magazine in February 2009, the contract for which is dated July 25, 2008. Doc. 131-1 at 17; 140-17. Burciaga was paid ██████ for this contract, which required that she sit for a still photography session, filming sessions, and potential additional photography or filming sessions, that she complete up to 20 days of promotional appearances, and that she conduct at least one one-hour online chat on Playboy's website, among other responsibilities. *Id*. The contract also prohibited her from doing any other nudity work for two years. *Id.*

The third contract, provided by both parties, is with Sailor and Saint, Burciaga's own apparel company, which paid her ██████ as part of an "Ambassadorial program" in 2014, responsibilities for which included participation in question-and-answer sessions with the media, event attendance, photography and audiovisual shoot days, magazine shoot days, three social media actions per week, and three "personal life" social media posts wearing the product. Doc.

---

[8] No further information concerning the value of ████████████████████████████████████ was provided.

[9] ████████████ are, arguably, what Defendants misappropriated in this case.

131-1 at 16; 140-16.  Sailor and Saint also obtained rights to use her name, image, likeness, biography, and quotes throughout their media for 12 months.  *Id.*  The contract also prohibited her from similar work with any products or services of a competitor of Sailor and Saint.  *Id.*

The fourth contract, provided by Defendants, is with Ardell Lashes in 2017, for which Burciaga was paid ███████████████████████ Doc. 140-15.  ████████████████████████████████████████████████████████████████ ████████████.  *Id*.

Lastly, while a copy of the contract was not provided, Burciaga stated in her deposition that the photos misappropriated by defendants were initially taken in approximately 2009 for SHOW Magazine.  Doc. 141 at 16.  The compilation of the three photos appeared in the print magazine as well as on a magazine insert and on SHOW Magazine's website.  *Id.*  Burciaga was paid a total of ██████ for this work at that time, approximately six years before defendants used the photos.  *Id.*

### III.   DISCUSSION

For reasons explained below, both Chamberlin and Anson's expert opinions are of little help to the Court and will not be considered.  Instead, the Court examines Burciaga's past contracts to determine the fair market value of Burciaga's images.

### A.   Chamberlin's Expert Opinion

Courts in the Southern District of New York has previously rejected methodology similar to Chamberlin's.  *See Edmondson v. RCI*, 2020 WL 1503452, at *6.  In *Edmondson v. RCI*, a similar case in which Burciaga also was a Plaintiff, a different expert (Anderson) evaluated the fair market value of misappropriated images for the defendants in that case by, in part, analyzing Burciaga's contract with Crazy Horse III.  *Id.*  While the expert acknowledged that the contract

9

went beyond a day shoot to include additional interviews, hosting responsibilities, photography sessions, and online promotions, the expert did not explain the breakdown of what portion of the $3,500 contract compensated each obligation, leaving the court no way to determine whether the expert's suggested damages were an accurate estimate of the fair market value.

The same is true of Chamberlin's submissions in the present case. While Chamberlin had access to and purportedly reviewed Burciaga's past contracts, he does not explain specifically how he arrived at the $40,000 per image per use rate as compared to Burciaga's past contracts. Chamberlin also does not explain the differences in obligations in Burciaga's past contracts which required her to participate in multiple days of events, shoots, significant social media responsibilities, and the requirement that she abstain from other professional opportunities, and a hypothetical Sin City contract, which presumably would have only required a one-day photo shoot. *See Electra*, 987 F.3d at 254 ("the 'payment history' the Chamberlin Report relies on is derived in part from contractual agreements that paid [plaintiffs] for substantially more than what [they] seek compensation for here—namely, the fair market value of a single photoshoot.").

Chamberlin has also failed to explain the large discrepancy between the total amount of damages claimed ($160,000) and the largest contract Burciaga has ever had—███ for an "Ambassadorial role" with Burciaga's own apparel company. Chamberlin did not include this analysis in an opinion he gave for plaintiffs in *Edmondson v. RCI* either, resulting in the exclusion of his expert opinion. There, Chamberlin did not explain which, if any, of Plaintiff's prior contracts he used to derive a daily rate, did not account for the additional obligations that were part of those contracts, and did not explain why the images at issue in *Edmondson v. RCI* should be valued at fifteen times more than what the plaintiff was paid in another photoshoot. 2020 WL 1503452, at *8–9. Chamberlin's confusing discussion of premiums and

embarrassment factors has also been used as one basis for excluding his testimony in at least one other court.  Doc. 140-1 at 5 (order denying damages in *Timed Out, LLC v. Prisma Entertainment, LLC, et. al*, Case No. BC663581 (Cal. Superior Ct., L.A. County, April 10, 2019)).

Chamberlin's deficiencies do not end there.  Chamberlin's multiplication of Burciaga's purported day rate for each "usage" does not comport with industry standard as evidenced by Burciaga's existing contracts.  *See Electra*, 987 F.3d at 254–55 ("This methodology resulted in calculations of damages amounts far greater than the actual amount [plaintiffs] received for the photographs in the first instance.").  The Court agrees with Defendants that the usage multiplier is not supported by Chamberlin's citation to handpicked pages of the White Book, which does not even mention Instagram, the social media site where the advertisement was actually posted.  Doc. 131-3.  Defendants claim that the White Book has not been published or relied upon for years.  Doc. 141 at 9.  A court in this District has also previously rejected Chamberlin's usage multiplier, finding that evidence contradicts the proposition that a model's fees are calculated by multiplying a working day rate by the number of distinct usages.  *See Toth*, 2019 WL 95564, at *12 (striking Chamberlin's report and testimony as speculative and based on unreliable methodology); *see also Electra*, 987 F.3d at 255 (2d Cir. 2021) ("the Chamberlin Report therefore systematically overestimated the fair market value of the photographs at issue").  Lastly, Burciaga herself could not recall a time when she had been paid per usage in the manner Chamberlin suggests.  Doc. 140-12 at 245:14–19.

### B. Anson's Rebuttal Opinion

Anson's argues that stock images are the appropriate measure of fair market value.  The Southern District of New York has previously rejected the same argument Anson makes here in

a similar right of publicity case. *See Edmondson*, 2020 WL 1503452, at *5 (excluding a similar expert opinion of Anson's business partner, Jeff Anderson, because of flaws in methodology). Specifically, the court rejected the use of stock images as a benchmark for the fair market value of misappropriated images because the images at issue were not available online for royalty-free licenses. *Id*. The Court also agrees with Burciaga that the plain language of Shutterstock's Terms of Use (a stock image website) show that stock images could not be used in strip club advertisements. Doc. 131-12 at 6. Anson's lack of experience in the modeling industry further weakens his persuasiveness.

Lastly, Plaintiff points out that Anson has employed a completely different methodology in evaluating fair market value when he has been retained instead by plaintiffs in a case involving misappropriated images. Doc. 130 at 14. In *Olive v. GNC, Inc.*, 242 Cal. Rptr. 3d 15, 18 (Ct. App. 2018), a case involving use of a model's likeness after the right to do so expired, Anson based his valuation opinion not on stock photo prices, but rather on comparisons to royalty agreements with celebrities such as Michael Jordan, Alex Rodriguez, and Tyra Banks, despite the fact that the plaintiff had nowhere near the same level of fame. The court thus held that Anson's testimony was properly excluded. *Id.* at 27.

### C. Comparison to Burciaga's Past Contracts

Burciaga is entitled to recovery of the fair market value of the image. *See Electra*, 987 F.3d at 256. There is no precedent holding that an expert opinion is required to prove compensatory damages in an action under Section 51. *Id*. The Second Circuit has left open to district courts to determine whether an expert opinion is required to prove the fair market value of photographs in cases like this. *Id.* at 257. The parties have not brought to the Court's attention any damage awards that were not issued in connection with the entry of default

judgments.  However, the parties have submitted copies of four of Burciaga's prior contracts as comparators, as well as information on Burciaga's SHOW Magazine photoshoot.  Docs. 140-13, 140-15, 140-16, 140-17, 141 at 16.  The Court therefore has a number of reference points from which to make a reasoned determination of the damages owed in this case without relying on the parties' experts.

A fair market value analysis should consider or acknowledge prior similar contracts and account for any additional obligations in those comparator contracts.  *See Edmondson II*, 2020 WL 2731968, at *2.  In arriving at a particular rate, the valuation should not be speculative and the reasons behind the valuation should be explained.  *See Caliente Resorts*, 2017 WL 10591833, at *6; *Gibson v. BTS N.*, 2018 WL 888872, at *11.  With these principles in mind, the Court turns to Burciaga's past contracts.

Accepting that association with gentlemen's clubs brings unique considerations for models, the best comparators to help determine appropriate damages in this case are Burciaga's contract with Crazy Horse III Gentlemen's Club in Las Vegas, Nevada, which involves a similar establishment, her contract with Ardell Lashes in 2017, entered into after the filing of this suit, and the amount she was paid for the SHOW Magazine photo shoot, which produced the three photographs used here.  Burciaga willingly associated herself with the Crazy Horse club and is not aware of any ridicule connected with this association.  Doc. 123 at 15.  In the Court's estimation, this event is comparable to the type of contract that Burciaga would have entered into with Defendants.  Although the Court agrees with Chamberlin that there may be a reputational difference between hosting an event at a gentlemen's club for a Mexican Independence Day event and being advertised as an actual stripper at Defendants' club, ▓▓▓▓▓▓▓▓▓▓▓▓ merit additional pay that the court believes would be comparable to a

13

hypothetical contract with Defendants for the one Instagram post at issue. Likewise, the more recent Ardell Lashes contract more closely approximates the duties Burciaga would have had to carry out to comply with a like contract here—a one day photo shoot. However, the documentation regarding this contract is scant, and without knowing the nature of the images or whether there were additional obligations associated with the contract, the Court cannot draw many inferences about this contract's comparability to the hypothetical contract at issue

Burciaga's 2009 photo shoot for SHOW Magazine is highly relevant. This photoshoot produced the photos at issue, which were to be published online and in a print magazine. Burciaga was paid ▇▇▇ for this work, although the details of her contractual requirements are not known.

The other two contracts provided are of little value to the Court. Burciaga's 2008 Playmate of the Month contract, for which she was paid ▇▇▇, required significantly greater obligations. Doc. 140-17. Playboy, the iconic men's magazine, likely is more reputable of an association than a gentlemen's club, so it is not a perfect comparator. This contract also presumably involved nudity, unlike the images at issue here. Further, it is clear that this Playboy contract's responsibilities far exceeded what would have been required of Burciaga for the Instagram post at issue. Burciaga's 2014 contract with Sailor and Saint is not a fair representation of Burciaga's fair market value because it is her own company. *See Toth*, 2019 WL 95564, at *12 ("What [plaintiff] pays herself for her image cannot be the foundation for a reliable calculation of fair market value."). Therefore, the Court accords the value of this contract only minimal weight.

Therefore, based on Burciaga's previous work history, allowing for some appreciation of her fair market value with the passage of time, and weighing the differences between the three

most analogous contracts—Crazy Horse–███; SHOW Magazine–███; and Ardell Lashes–███—, the Court awards damages in the amount of $5,000.

## IV.     CONCLUSION

For the foregoing reasons, Plaintiff has judgment against Defendants, jointly and severally, in the amount of $5,000. The Clerk of Court is respectfully directed to terminate the motion, Doc. 155.

SO ORDERED.

Dated: March 25, 2022
       New York, New York

_____
Edgardo Ramos, U.S.D.J.